TRANS WORLD AIRLINES, INC. *v.* HARDISON ET AL.

No. 75–1126.   Argued March 30, 1977—Decided June 16, 1977*

*Together with No. 75–1385, *International Assn. of Machinists & Aerospace Workers, AFL–CIO, et al.* v. *Hardison et al.,* also on certiorari to the same court.

64

White, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, Powell, Rehnquist, and Stevens, JJ., joined. Marshall, J., filed a dissenting opinion, in which Brennan, J., joined, *post*, p. 85.

George E. Feldmiller argued the cause for petitioner in No. 75–1126. With him on the brief was Dick H. Woods. Mozart G. Ratner argued the cause for petitioners in No. 75–1385. With him on the briefs were Plato E. Papps and Michael D. Gordon.

William F. Pickett argued the cause for respondent Hardison in both cases. With him on the brief was Thomas L. Hogan.

Nathan Lewin argued the cause for the National Jewish Commission on Law and Public Affairs as amicus curiae urging affirmance. With him on the brief were Dennis Rapps and Howard I. Rhine.†

---

†Briefs of amici curiae urging reversal were filed by William L. Hungate, Edwin D. Akers, Jr., Charles A. Newman, and A. William Rolf for the Chrysler Corp.; and by Jay S. Siegel, Robert E. Williams, and Douglas S. McDowell for the Equal Employment Advisory Council.

Briefs of amici curiae urging affirmance were filed by Acting Solicitor General Friedman, Assistant Attorney General Days, Deputy Solicitor General Wallace, Allan A. Ryan, Jr., Brian K. Landsberg, Dennis J.

66

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 703 (a)(1) of the Civil Rights Act of 1964, Title VII, 78 Stat. 255, 42 U. S. C. § 2000e–2 (a)(1), makes it an unlawful employment practice for an employer to discriminate against an employee or a prospective employee on the basis of his or her religion. At the time of the events involved here, a guideline of the Equal Employment Opportunity Commission (EEOC), 29 CFR § 1605.1 (b) (1968), required, as the Act itself now does, 42 U. S. C. § 2000e (j) (1970 ed., Supp. V), that an employer, short of "undue hardship," make "reasonable accommodations" to the religious needs of its employees. The issue in this case is the extent of the employer's obligation under Title VII to accommodate an employee whose religious beliefs prohibit him from working on Saturdays.

I

We summarize briefly the facts found by the District Court. 375 F. Supp. 877 (WD Mo. 1974).

Petitioner Trans World Airlines (TWA) operates a large maintenance and overhaul base in Kansas City, Mo. On June 5, 1967, respondent Larry G. Hardison was hired by TWA to work as a clerk in the Stores Department at its Kansas City base. Because of its essential role in the Kansas City operation, the Stores Department must operate 24 hours per day, 365 days per year, and whenever an employee's job in that department is not filled, an employee must be

---

*Dimsey,* and *Abner W. Sibal* for the United States et al.; by *Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Michael A. Lockman* and *Gary G. Kress,* Assistant Attorneys General, for the State of Michigan; by *Beverly Gross* for the New York State Division of Human Rights; by *Joel M. Gora* and *Leo Pfeffer* for the American Civil Liberties Union; by *Mr. Pfeffer* for the Central Conference of American Rabbis et al.; by *Warren L. Johns* for the General Conference of Seventh-Day Adventists; and by *Ralph K. Helge* for the Worldwide Church of God.

shifted from another department, or a supervisor must cover the job, even if the work in other areas may suffer.

Hardison, like other employees at the Kansas City base, was subject to a seniority system contained in a collective-bargaining agreement[1] that TWA maintains with petitioner International Association of Machinists and Aerospace Workers (IAM).[2] The seniority system is implemented by the union steward through a system of bidding by employees for particular shift assignments as they become available. The most senior employees have first choice for job and shift assignments, and the most junior employees are required to work when the union steward is unable to find enough people willing to work at a particular time or in a particular job to fill TWA's needs.

In the spring of 1968 Hardison began to study the religion known as the Worldwide Church of God. One of the tenets of that religion is that one must observe the Sabbath by refraining from performing any work from sunset on Friday until sunset on Saturday. The religion also proscribes work on certain specified religious holidays.

When Hardison informed Everett Kussman, the manager of the Stores Department, of his religious conviction regarding

---

[1] The TWA–IAM agreement provides in pertinent part:

"The principle of seniority shall apply in the application of this Agreement in all reductions or increases of force, preference of shift assignment, vacation period selection, in bidding for vacancies or new jobs, and in all promotions, demotions, or transfers involving classifications covered by this Agreement.

.    .    .    .    .

"Except as hereafter provided in this paragraph, seniority shall apply in selection of shifts and days off within a classification within a department . . . ." App. 214.

[2] TWA is the petitioner in No. 75–1126. Petitioners in No. 75–1385 are the international, local, and district levels of IAM, hereinafter collectively referred to as IAM or the union.

observance of the Sabbath, Kussman agreed that the union steward should seek a job swap for Hardison or a change of days off; that Hardison would have his religious holidays off whenever possible if Hardison agreed to work the traditional holidays when asked; and that Kussman would try to find Hardison another job that would be more compatible with his religious beliefs. The problem was temporarily solved when Hardison transferred to the 11 p. m.–7 a. m. shift. Working this shift permitted Hardison to observe his Sabbath.

The problem soon reappeared when Hardison bid for and received a transfer from Building 1, where he had been employed, to Building 2, where he would work the day shift. The two buildings had entirely separate seniority lists; and while in Building 1 Hardison had sufficient seniority to observe the Sabbath regularly, he was second from the bottom on the Building 2 seniority list.

In Building 2 Hardison was asked to work Saturdays when a fellow employee went on vacation. TWA agreed to permit the union to seek a change of work assignments for Hardison, but the union was not willing to violate the seniority provisions set out in the collective-bargaining contract,[3] and Hardison had insufficient seniority to bid for a shift having Saturdays off.

A proposal that Hardison work only four days a week was rejected by the company. Hardison's job was essential, and on weekends he was the only available person on his shift to perform it. To leave the position empty would have impaired supply shop functions, which were critical to airline operations; to fill Hardison's position with a supervisor or an

---

[3] The union did have a Relief Committee organized to deal with the emergency problems of its members. The record reveals that in the past this Committee had been instrumental in arranging for temporary adjustments in work schedules to meet the needs of union members; but the record also reveals that the Relief Committee had almost never arranged permanent changes in work assignments and that Hardison never sought the assistance of that Committee.

employee from another area would simply have undermanned another operation; and to employ someone not regularly assigned to work Saturdays would have required TWA to pay premium wages.

When an accommodation was not reached, Hardison refused to report for work on Saturdays. A transfer to the twilight shift proved unavailing since that schedule still required Hardison to work past sundown on Fridays. After a hearing, Hardison was discharged on grounds of insubordination for refusing to work during his designated shift.

Hardison, having first invoked the administrative remedy provided by Title VII, brought this action for injunctive relief in the United States District Court against TWA and IAM, claiming that his discharge by TWA constituted religious discrimination in violation of Title VII, 42 U. S. C. § 2000e–2 (a)(1). He also charged that the union had discriminated against him by failing to represent him adequately in his dispute with TWA and by depriving him of his right to exercise his religious beliefs. Hardison's claim of religious discrimination rested on 1967 EEOC guidelines requiring employers "to make reasonable accommodations to the religious needs of employees" whenever such accommodation would not work an "undue hardship," 29 CFR § 1605.1 (1968), and on similar language adopted by Congress in the 1972 amendments to Title VII, 42 U. S. C. § 2000e (j) (1970 ed., Supp. V).

After a bench trial, the District Court ruled in favor of the defendants. Turning first to the claim against the union, the District Court ruled that although the 1967 EEOC guidelines were applicable to unions, the union's duty to accommodate Hardison's belief did not require it to ignore its seniority system as Hardison appeared to claim.[4] As for Hardison's

---

[4] The District Court voiced concern that if it did not find an undue hardship in such circumstances, accommodation of religious observances might impose " 'a priority of the religious over the secular' " and thereby raise significant questions as to the constitutional validity of the statute

claim against TWA, the District Court rejected at the outset TWA's contention that requiring it in any way to accommodate the religious needs of its employees would constitute an unconstitutional establishment of religion. As the District Court construed the Act, however, TWA had satisfied its "reasonable accommodations" obligation, and any further accommodation would have worked an undue hardship on the company.

The Court of Appeals for the Eighth Circuit reversed the judgment for TWA. 527 F. 2d 33 (1975). It agreed with the District Court's constitutional ruling, but held that TWA had not satisfied its duty to accommodate. Because it did not appear that Hardison had attacked directly the judgment in favor of the union, the Court of Appeals affirmed that judgment without ruling on its substantive merits.

In separate petitions for certiorari TWA and IAM contended that adequate steps had been taken to accommodate Hardison's religious observances and that to construe the statute to require further efforts at accommodation would create an establishment of religion contrary to the First Amendment of the Constitution. TWA also contended that the Court of Appeals improperly ignored the District Court's findings of fact.

We granted both petitions for certiorari. 429 U. S. 958 (1976). Because we agree with petitioners that their conduct was not a violation of Title VII,[5] we need not reach the other questions presented.

---

under the Establishment Clause of the First Amendment. 375 F. Supp. 877, 883 (WD Mo. 1974), quoting Edwards & Kaplan, Religious Discrimination and the Role of Arbitration Under Title VII, 69 Mich. L. Rev. 599, 628 (1971).

[5] Because the judgment in its favor was affirmed by the Court of Appeals, the union was a prevailing party below; and Hardison has not filed a petition for certiorari seeking to change that judgment. It may thus appear anomalous to have granted the union's petition for certiorari as well as that of TWA. But the union's view is that the judgment below

## II

The Court of Appeals found that TWA had committed an unlawful employment practice under § 703 (a)(1) of the Act, 42 U. S. C. § 2000e–2 (a)(1), which provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

The emphasis of both the language and the legislative history of the statute is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin.[6] This is true regardless of whether

---

against TWA seriously involves union interests, because the rationale of the Court of Appeals' opinion, as the union understands it, "necessarily and explicitly assumes that petitioner Unions are legally obligated to waive or vary provisions of their collective bargaining agreement in order to accommodate respondent Hardison's beliefs, if called upon by TWA to do so." Pet. for Cert. in No. 75–1385, p. 2. This would appear to be the position of Hardison and the EEOC in this Court. Since we reverse the judgment against TWA, we need not pursue further the union's status in this Court.

[6] See *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 278–279 (1976); *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 763 (1976); *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 800 (1973); *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 429–430 (1971).

From the outset, Congress has said that "[t]he purpose of [Title VII] is to eliminate, through the utilization of formal and informal remedial procedures, discrimination in employment based on race, color, religion, or national origin." H. R. Rep. No. 914, 88th Cong., 1st Sess., 26 (1963). See 110 Cong. Rec. 13079–13080 (1964) (remarks of Sen. Clark). When Congress amended Title VII in 1972, it did not waver from its principal goal. While Congressmen differed on the best methods to eliminate discrimination in employment, no one questioned the desirability of

the discrimination is directed against majorities or minorities. *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273, 280 (1976). See *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971).

The prohibition against religious discrimination soon raised the question of whether it was impermissible under § 703 (a)(1) to discharge or refuse to hire a person who for religious reasons refused to work during the employer's normal work-week. In 1966 an EEOC guideline dealing with this problem declared that an employer had an obligation under the statute "to accommodate to the reasonable religious needs of employees . . . where such accommodation can be made without serious inconvenience to the conduct of the business." 29 CFR § 1605.1 (1967).

In 1967 the EEOC amended its guidelines to require employers "to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business." 29 CFR § 1605.1 (1968). The EEOC did not suggest what sort of accommodations are "reasonable" or when hardship to an employer becomes "undue." [7]

---

seeking that goal. Compare H. R. Rep. No. 92–238 (1971) (majority report of the Committee of the Whole House), with *id.*, at 58 (minority report).

[7] The EEOC expressed the view that "undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similiar qualifications during the period of absence of the Sabbath observer," 29 CFR § 1605.1 (1968). This single example was by no means intended to be exhaustive. In substance, the EEOC left further definition of its guidelines to its review of "each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people." *Ibid.* The EEOC at that time did not purport to change the view expressed in its 1966 guidelines that work schedules generally applicable to all employees may not be unreasonable, even if they do not "operate with uniformity . . . upon

This question—the extent of the required accommodation—remained unsettled when this Court, in *Dewey* v. *Reynolds Metals Co.*, 402 U. S. 689 (1971), affirmed by an equally divided Court the Sixth Circuit's decision in 429 F. 2d 324 (1970). The discharge of an employee who for religious reasons had refused to work on Sundays was there held by the Court of Appeals not to be an unlawful employment practice because the manner in which the employer allocated Sunday work assignments was discriminatory in neither its purpose nor effect; and consistent with the 1967 EEOC guidelines, the employer had made a reasonable accommodation of the employee's beliefs by giving him the opportunity to secure a replacement for his Sunday work.[8]

In part "to resolve by legislation" some of the issues raised in *Dewey*, 118 Cong. Rec. 706 (1972) (remarks of Sen. Randolph), Congress included the following definition of religion in its 1972 amendments to Title VII:

"The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accom-

the religious observances of [all] employees." The EEOC's present view, expressed in an *amicus curiae* brief filed in support of Hardison and the Court of Appeals' judgment, is now otherwise, at least to some extent.

[8] Judgment entered by an equally divided Court is not "entitled to precedential weight," *Neil* v. *Biggers*, 409 U. S. 188, 192 (1972). Our ruling in *Dewey* thus does not resolve the questions there presented. Other factors, as well, make the impact of *Dewey* inconclusive. The conduct alleged to be an unlawful employment practice occurred prior to the promulgation of the 1967 guidelines, and the Court of Appeals expressed the view that those guidelines should not be given retroactive effect. Also, an earlier ruling by an arbitrator was held to have conclusively resolved the religious discrimination question in favor of the employer. But see *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974). Finally, the employer in *Dewey* was not excused from a duty to accommodate; the Court of Appeals simply held that the employer had satisfied any obligation that it might have had under the statute.

modate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." § 701 (j), 42 U. S. C. § 2000e (j) (1970 ed., Supp. V).

The intent and effect of this definition was to make it an unlawful employment practice under § 703 (a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees. But like the EEOC guidelines, the statute provides no guidance for determining the degree of accommodation that is required of an employer. The brief legislative history of § 701 (j) is likewise of little assistance in this regard.[9] The proponent of the measure, Senator Jennings

---

[9] Section 701 (j) was added to the 1972 amendments on the floor of the Senate. The legislative history of the measure consists chiefly of a brief floor debate in the Senate, contained in less than two pages of the Congressional Record and consisting principally of the views of the proponent of the measure, Senator Jennings Randolph. 118 Cong. Rec. 705–706 (1972).

The Congressional Record, 118 Cong. Rec. 706–713 (1972), also contains reprints of *Dewey* and *Riley* v. *Bendix Corp.*, 330 F. Supp. 583 (MD Fla. 1971), rev'd, 464 F. 2d 1113 (CA5 1972), as well as a brief synopsis of the new provision, which makes reference to *Dewey*, 118 Cong. Rec. 7167 (1972). The significance of the legislative references to prior case law is unclear. In *Riley* the District Court ruled that an employer who discharged an employee for refusing to work on his Sabbath had not committed an unfair labor practice even though the employer had not made any effort whatsoever to accommodate the employee's religious needs. It is clear from the language of § 701 (j) that Congress intended to change this result by requiring some form of accommodation; but this tells us nothing about how much an employer must do to satisfy its statutory obligation.

The reference to *Dewey* is even more opaque:

"The purpose of this subsection is to provide the statutory basis for EEOC to formulate guidelines on discrimination because of religion such as those challenged in *Dewey* v. *Reynolds Metals Company*, 429 F. 2d 325 (6th Cir. 1970), *Affirmed by an equally divided court*, 402 U. S. 689

Randolph, expressed his general desire "to assure that freedom from religious discrimination in the employment of workers is for all time guaranteed by law," 118 Cong. Rec. 705 (1972), but he made no attempt to define the precise circumstances under which the "reasonable accommodation" requirement would be applied.[10]

In brief, the employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear, but the reach of that obligation has never been spelled out by Congress or by EEOC guidelines. With this in mind, we turn to a consideration of whether TWA has met its obliga-

---

(1971)." 118 Cong. Rec. 7167 (1972). Clearly, any suggestion in *Dewey* that an employer may not be required to make *reasonable* accommodation for the religious needs of its employees was disapproved by § 701 (j); but Congress did not indicate that "reasonable accommodation" requires an employer to do more than was done in *Dewey,* apparently preferring to leave that question open for future resolution by the EEOC. See also n. 8, *supra.*

[10] Cases decided by the Courts of Appeals since the enactment of the 1972 amendments to Title VII similarly provide us with little guidance as to the scope of the employer's obligation. In circumstances where an employer has declined to take steps that would burden some employees in order to permit another employee or prospective employee to observe his Sabbath, the Fifth, Sixth, and Tenth Circuits have found no violation for failure to accommodate. *Williams* v. *Southern Union Gas Co.,* 529 F. 2d 483 (CA10 1976); *Reid* v. *Memphis Publishing Co.,* 521 F. 2d 512 (CA6 1975), cert. denied, 429 U. S. 964 (1976), pet. for rehearing pending, No. 75–1105; *Johnson* v. *U. S. Postal Service,* 497 F. 2d 128 (CA5 1974). But the Fifth and Sixth Circuits have also reached the opposite conclusion on similar facts. *Draper* v. *United States Pipe & Foundry Co.,* 527 F. 2d 515 (CA6 1975); *Cummins* v. *Parker Seal Co.,* 516 F. 2d 544 (CA6 1975), aff'd by equally divided Court, 429 U. S. 65 (1976); *Riley* v. *Bendix Corp.,* 464 F. 2d 1113 (CA5 1972). These apparent intra-Circuit conflicts may be explainable on the basis of the differing facts of each case, but neither the Fifth nor the Sixth Circuit has suggested a theory of decision to justify the differing results that have been reached.

tion under Title VII to accommodate the religious observances of its employees.

### III

The Court of Appeals held that TWA had not made reasonable efforts to accommodate Hardison's religious needs under the 1967 EEOC guidelines in effect at the time the relevant events occurred.[11] In its view, TWA had rejected three reasonable alternatives, any one of which would have satisfied its obligation without undue hardship. First, within the framework of the seniority system, TWA could have permitted Hardison to work a four-day week, utilizing in his place a supervisor or another worker on duty elsewhere. That this would have caused other shop functions to suffer was insufficient to amount to undue hardship in the opinion of the Court of Appeals. Second—according to the Court of Appeals, also within the bounds of the collective-bargaining contract—the company could have filled Hardison's Saturday shift from other available personnel competent to do the job, of which the court said there were at least 200. That this would have involved premium overtime pay was not deemed an undue hardship. Third, TWA could have arranged a "swap between Hardison and another employee either for another shift or for the Sabbath days." In response to the assertion that this would have involved a breach of the senior-

---

[11] Ordinarily, an EEOC guideline is not entitled to great weight where, as here, it varies from prior EEOC policy and no new legislative history has been introduced in support of the change. *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 140–145 (1976). But where "Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation," *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381–382 (1969) (footnote omitted), the guideline is entitled to some deference, at least sufficient in this case to warrant our accepting the guideline as a defensible construction of the pre-1972 statute, *i. e.,* as imposing on TWA the duty of "reasonable accommodation" in the absence of "undue hardship." We thus need not consider whether § 701 (j) must be applied retroactively to the facts of this litigation.

ity provisions of the contract, the court noted that it had not been settled in the courts whether the required statutory accommodation to religious needs stopped short of transgressing seniority rules, but found it unnecessary to decide the issue because, as the Court of Appeals saw the record, TWA had not sought, and the union had therefore not declined to entertain,. a possible variance from the seniority provisions of the collective-bargaining agreement. The company had simply left the entire matter to the union steward who the Court of Appeals said "likewise did nothing."

We disagree with the Court of Appeals in all relevant respects. It is our view that TWA made reasonable efforts to accommodate and that each of the Court of Appeals' suggested alternatives would have been an undue hardship within the meaning of the statute as construed by the EEOC guidelines.

### A

It might be inferred from the Court of Appeals' opinion and from the brief of the EEOC in this Court that TWA's efforts to accommodate were no more than negligible. The findings of the District Court, supported by the record, are to the contrary. In summarizing its more detailed findings, the District Court observed:

> "TWA established as a matter of fact that it did take appropriate action to accommodate as required by Title VII. It held several meetings with plaintiff at which it attempted to find a solution to plaintiff's problems. It did accommodate plaintiff's observance of his special religious holidays. It authorized the union steward to search for someone who would swap shifts, which apparently was normal procedure." 375 F. Supp., at 890–891.

It is also true that TWA itself attempted without success to find Hardison another job. The District Court's view was that TWA had done all that could reasonably be expected within the bounds of the seniority system.

The Court of Appeals observed, however, that the possibility of a variance from the seniority system was never really posed to the union. This is contrary to the District Court's findings and to the record. The District Court found that when TWA first learned of Hardison's religious observances in April 1968, it agreed to permit the union's steward to seek a swap of shifts or days off but that "the steward reported that he was unable to work out scheduling changes and that he understood that no one was willing to swap days with plaintiff." *Id.*, at 888. Later, in March 1969, at a meeting held just two days before Hardison first failed to report for his Saturday shift, TWA again "offered to accommodate plaintiff's religious observance by agreeing to any trade of shifts or change of sections that plaintiff and the union could work out . . . . Any shift or change was impossible within the seniority framework and the union was not willing to violate the seniority provisions set out in the contract to make a shift or change." *Id.*, at 889. As the record shows, Hardison himself testified that Kussman was willing, but the union was not, to work out a shift or job trade with another employee. App. 76–77.

We shall say more about the seniority system, but at this juncture it appears to us that the system itself represented a significant accommodation to the needs, both religious and secular, of all of TWA's employees. As will become apparent, the seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off. Additionally, recognizing that weekend work schedules are the least popular, the company made further accommodation by reducing its work force to a bare minimum on those days.

### B

We are also convinced, contrary to the Court of Appeals, that TWA itself cannot be faulted for having failed to work

out a shift or job swap for Hardison. Both the union and TWA had agreed to the seniority system; the union was unwilling to entertain a variance over the objections of men senior to Hardison; and for TWA to have arranged unilaterally for a swap would have amounted to a breach of the collective-bargaining agreement.

### (1)

Hardison and the EEOC insist that the statutory obligation to accommodate religious needs takes precedence over both the collective-bargaining contract and the seniority rights of TWA's other employees. We agree that neither a collective-bargaining contract nor a seniority system may be employed to violate the statute,[12] but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement. Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts. Without a clear and express indication from Congress, we cannot agree with Hardison and the EEOC that an agreed-upon seniority system must give way when necessary to accommodate religious observances. The issue is important and warrants some discussion.

---

[12] "This Court has long held that employee expectations arising from a seniority system agreement may be modified by statutes furthering a strong public policy interest." *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 778. Cf. *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974). In *Franks* we held that it was permissible to award retroactive seniority to victims of past discrimination in order to implement the strong congressional policy of making victims of discrimination whole. *Franks* is not dispositive of the present case since here there is no evidence of past discrimination that must be remedied. Not only is the "make-whole" policy not present in this case, but, as we shall see, the strong congressional policy against discrimination in employment argues against interpreting the statute to require the abrogation of the seniority rights of some employees in order to accommodate the religious needs of others.

Any employer who, like TWA, conducts an around-the-clock operation is presented with the choice of allocating work schedules either in accordance with the preferences of its employees or by involuntary assignment. Insofar as the varying shift preferences of its employees complement each other, TWA could meet its manpower needs through voluntary work scheduling. In the present case, for example, Hardison's supervisor foresaw little difficulty in giving Hardison his religious holidays off since they fell on days that most other employees preferred to work, while Hardison was willing to work on the traditional holidays that most other employees preferred to have off.

Whenever there are not enough employees who choose to work a particular shift, however, some employees must be assigned to that shift even though it is not their first choice. Such was evidently the case with regard to Saturday work; even though TWA cut back its weekend work force to a skeleton crew, not enough employees chose those days off to staff the Stores Department through voluntary scheduling. In these circumstances, TWA and IAM agreed to give first preference to employees who had worked in a particular department the longest.

Had TWA nevertheless circumvented the seniority system by relieving Hardison of Saturday work and ordering a senior employee to replace him, it would have denied the latter his shift preference so that Hardison could be given his. The senior employee would also have been deprived of his contractual rights under the collective-bargaining agreement.

It was essential to TWA's business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off. Allocating the burdens of weekend work was a matter for collective bargaining. In considering criteria to govern this allocation, TWA and the union had two alternatives: adopt a neutral system, such as seniority, a lottery, or rotating shifts; or allocate days off in

accordance with the religious needs of its employees. TWA would have had to adopt the latter in order to assure Hardison and others like him of getting the days off necessary for strict observance of their religion, but it could have done so only at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends. There were no volunteers to relieve Hardison on Saturdays, and to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.

Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities. See *supra,* at 71–72. Indeed, the foundation of Hardison's claim is that TWA and IAM engaged in religious *discrimination* in violation of 703 (a)(1) when they failed to arrange for him to have Saturdays off. It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

(2)

Our conclusion is supported by the fact that seniority systems are afforded special treatment under Title VII itself. Section 703 (h) provides in pertinent part:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of em-

ployment pursuant to a bona fide seniority or merit sys-
tem . . . provided that such differences are not the result
of an intention to discriminate because of race, color,
religion, sex, or national origin . . . ." 42 U. S. C.
§ 2000e–2 (h).

"[T]he unmistakable purpose of § 703 (h) was to make clear
that the routine application of a bona fide seniority system
would not be unlawful under Title VII." *Teamsters* v. *United
States,* 431 U. S. 324, 352 (1977). See also *United Air Lines,
Inc.* v. *Evans,* 431 U. S. 553 (1977). Section 703 (h) is "a
definitional provision; as with the other provisions of § 703,
subsection (h) delineates which employment practices are
illegal and thereby prohibited and which are not." *Franks*
v. *Bowman Transportation Co.,* 424 U. S. 747, 758 (1976).
Thus, absent a discriminatory purpose, the operation of a
seniority system cannot be an unlawful employment practice
even if the system has some discriminatory consequences.

There has been no suggestion of discriminatory intent in
this case. "The seniority system was not designed with the
intention to discriminate against religion nor did it act to lock
members of any religion into a pattern wherein their freedom
to exercise their religion was limited. It was coincidental that
in plaintiff's case the seniority system acted to compound his
problems in exercising his religion." 375 F. Supp., at 883.
The Court of Appeals' conclusion that TWA was not limited
by the terms of its seniority system was in substance nothing
more than a ruling that operation of the seniority system was
itself an unlawful employment practice even though no dis-
criminatory purpose had been shown. That ruling is plainly
inconsistent with the dictates of § 703 (h), both on its face and
as interpreted in the recent decisions of this Court.[13]

---

[13] *Franks* v. *Bowman Transportation Co.,* is not to the contrary. In
*Franks* we held that "once an illegal discriminatory practice occurring
after the effective date of the Act is proved," 424 U. S., at 762, § 703 (h)
does not bar an award of retroactive seniority status to victims of that

As we have said, TWA was not required by Title VII to carve out a special exception to its seniority system in order to help Hardison to meet his religious obligations.[14]

discriminatory practice. Here the suggested exception to the TWA–IAM seniority system would not be remedial; the operation of the seniority system itself is said to violate Title VII. In such circumstances, § 703 (h) unequivocally mandates that there is no statutory violation in the absence of a showing of discriminatory purpose. See *United Air Lines, Inc.* v. *Evans,* 431 U. S. 553, 558–560 (1977).

[14] Despite its hyperbole and rhetoric, the dissent appears to agree with—at least it stops short of challenging—the fundamental proposition that Title VII does not require an employer and a union who have agreed on a seniority system to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices. This is the principal issue on which TWA and the union came to this Court. The dissent is thus reduced to (1) asserting that the statute requires TWA to accommodate Hardison even though substantial expenditures are required to do so; and (2) advancing its own view of the record to show that TWA could have done more than it did to accommodate Hardison without violating the seniority system or incurring substantial additional costs. We reject the former assertion as an erroneous construction of the statute. As for the latter, we prefer the findings of the District Judge who heard the evidence. Thus, the dissent suggests that through further efforts TWA or the union might have arranged a temporary or permanent job swap within the seniority system, despite the District Court's express finding, supported by the record, that "[t]he seniority provisions . . . precluded the possibility of plaintiff's changing his shift." 375 F. Supp., at 884. Similarly, the dissent offers two alternatives—sending Hardison back to Building 1 or allowing him to work extra days without overtime pay— that it says could have been pursued by TWA or the union, even though neither of the courts below even hinted that these suggested alternatives would have been feasible under the circumstances. Furthermore, Buildings 1 and 2 had separate seniority lists, and insofar as the record shows, a return to Building 1 would not have solved Hardison's problems. Hardison himself testified that he "gave up" his Building 1 seniority when he came to Building 2, App. 104, and that the union would not accept his early return to Building 1 in part "because the problem of seniority came up again." *Id.,* at 71. We accept the District Court's findings that TWA had done all that it could do to accommodate Hardison's religious beliefs without either incurring substantial costs or violating the seniority rights of other employees. See 375 F. Supp., at 891.

## C

The Court of Appeals also suggested that TWA could have permitted Hardison to work a four-day week if necessary in order to avoid working on his Sabbath. Recognizing that this might have left TWA short-handed on the one shift each week that Hardison did not work, the court still concluded that TWA would suffer no undue hardship if it were required to replace Hardison either with supervisory personnel or with qualified personnel from other departments. Alternatively, the Court of Appeals suggested that TWA could have replaced Hardison on his Saturday shift with other available employees through the payment of premium wages. Both of these alternatives would involve costs to TWA, either in the form of lost efficiency in other jobs or higher wages.

To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship.[15] Like abandonment of the seniority system, to require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion. By suggesting that TWA should incur certain costs in order to give Hardison Saturdays off the Court of Appeals would in effect require TWA to finance an additional Saturday off and then to choose the employee who will enjoy it on the basis of his religious beliefs. While incurring extra costs to secure a replacement for Hardison might remove the necessity of compelling another employee to work involun-

---

[15] The dissent argues that "the costs to TWA of either paying overtime or not replacing respondent would [not] have been more than *de minimis.*" *Post,* at 92 n. 6. This ignores, however, the express finding of the District Court that "[b]oth of these solutions would have created an undue burden on the conduct of TWA's business," 375 F. Supp., at 891, and it fails to take account of the likelihood that a company as large as TWA may have many employees whose religious observances, like Hardison's, prohibit them from working on Saturdays or Sundays.

tarily in Hardison's place, it would not change the fact that the privilege of having Saturdays off would be allocated according to religious beliefs.

As we have seen, the paramount concern of Congress in enacting Title VII was the elimination of discrimination in employment. In the absence of clear statutory language or legislative history to the contrary, we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath.

*Reversed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

One of the most intractable problems arising under Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.,* has been whether an employer is guilty of religious discrimination when he discharges an employee (or refuses to hire a job applicant) because of the employee's religious practices. Particularly troublesome has been the plight of adherents to minority faiths who do not observe the holy days on which most businesses are closed—Sundays, Christmas, and Easter—but who need time off for their own days of religious observance. The Equal Employment Opportunity Commission has grappled with this problem in two sets of regulations, and in a long line of decisions. Initially the Commission concluded that an employer was "free under Title VII to establish a normal workweek . . . generally applicable to all employees," and that an employee could not "demand any alteration in [his work schedule] to accommodate his religious needs." 29 CFR §§ 1605.1 (a)(3), (b)(3) (1967). Eventually, however, the Commission changed its view and decided that employers must reasonably accommodate such requested schedule changes except where "undue hardship" would result—for example, "where the employee's needed work cannot be per-

formed by another employee of substantially similar qualifications during the period of absence." 29 CFR § 1605.1 (b) (1976).[1] In amending Title VII in 1972 Congress confronted the same problem, and adopted the second position of the EEOC. Pub. L. 92–261, § 2(7), 86 Stat. 103, codified at 42 U. S. C. § 2000e (j) (1970 ed., Supp. V). Both before and after the 1972 amendment the lower courts have considered at length the circumstances in which employers must accommodate the religious practices of employees, reaching what the Court correctly describes as conflicting results, *ante,* at 75 n. 10. And on two occasions this Court has attempted to provide guidance to the lower courts, only to find ourselves evenly divided. *Parker Seal Co.* v. *Cummins,* 429 U. S. 65 (1976); *Dewey* v. *Reynolds Metals Co.,* 402 U. S. 689 (1971).

Today's decision deals a fatal blow to all efforts under Title VII to accommodate work requirements to religious practices. The Court holds, in essence, that although the EEOC regulations and the Act state that an employer must make reasonable adjustments in his work demands to take account of religious observances, the regulation and Act do not

---

[1] The Court's statement that in promulgating the second guidelines "[t]he EEOC . . . did not purport to change the view expressed in its 1966 guidelines that work schedules generally applicable to all employees may not be unreasonable," *ante,* at 72 n. 7, is incomprehensible. The preface to the later guidelines, 32 Fed. Reg. 10298 (1967), states that the "Commission hereby amends § 1605.1, Guidelines on Discrimination Because of Religion. . . . Section 1605.1 as amended shall read as follows . . . ." Thus the later guidelines expressly repealed the earlier guidelines. Moreover, the example of "undue hardship" given in the new guidelines and quoted in text makes clear that the Commission believed, contrary to its earlier view, that in certain instances employers would be required to excuse employees from work for religious observances.

In its decisions subsequent to the formulation of the guidelines, the Commission has consistently held that employers must accommodate Sabbath observances where substitute employees are available. Compare CCH EEOC Decisions (1973) ¶¶ 6060, 6154, with, *e. g.,* ¶¶ 6120, 6310, 6367.

really mean what they say. An employer, the Court concludes, need not grant even the most minor special privilege to religious observers to enable them to follow their faith. As a question of social policy, this result is deeply troubling, for a society that truly values religious pluralism cannot compel adherents of minority religions to make the cruel choice of surrendering their religion or their job. And as a matter of law today's result is intolerable, for the Court adopts the very position that Congress expressly rejected in 1972, as if we were free to disregard congressional choices that a majority of this Court thinks unwise. I therefore dissent.

## I

With respect to each of the proposed accommodations to respondent Hardison's religious observances that the Court discusses, it ultimately notes that the accommodation would have required "unequal treatment," *ante,* at 81, 84–85, in favor of the religious observer. That is quite true. But if an accommodation can be rejected simply because it involves preferential treatment, then the regulation and the statute, while brimming with "sound and fury," ultimately "signif[y] nothing."

The accommodation issue by definition arises only when a neutral rule of general applicability conflicts with the religious practices of a particular employee. In some of the reported cases, the rule in question has governed work attire; in other cases it has required attendance at some religious function; in still other instances, it has compelled membership in a union; and in the largest class of cases, it has concerned work schedules.[2] What all these cases have in common is an employee who could comply with the rule only by violating what the employee views as a religious commandment. In each

---

[2] Many of the cases are collected in Annot., 22 ALR Fed. 580 (1975). For a perceptive discussion of the issues posed by the cases see Note, Accommodation of an Employee's Religious Practices Under Title VII, 1976 U. Ill. L. Forum 867.

instance, the question is whether the employee is to be exempt from the rule's demands. To do so will always result in a privilege being "allocated according to religious beliefs," *ante,* at 85, unless the employer gratuitously decides to repeal the rule *in toto.* What the statute says, in plain words, is that such allocations are required unless "undue hardship" would result.

The point is perhaps best made by considering a not altogether hypothetical example. See CCH EEOC Decisions (1973) ¶ 6180. Assume that an employer requires all employees to wear a particular type of hat at work in order to make the employees readily identifiable to customers. Such a rule obviously does not, on its face, violate Title VII, and an employee who altered the uniform for reasons of taste could be discharged. But a very different question would be posed by the discharge of an employee who, for religious reasons, insisted on wearing over her hair a tightly fitted scarf which was visible through the hat. In such a case the employer could accommodate this religious practice without undue hardship—or any hardship at all. Yet as I understand the Court's analysis—and nothing in the Court's response, *ante,* at 83 n. 14, 84 n. 15, is to the contrary—the accommodation would not be required because it would afford the privilege of wearing scarfs to a select few based on their religious beliefs. The employee thus would have to give up either the religious practice or the job. This, I submit, makes a mockery of the statute.

In reaching this result, the Court seems almost oblivious of the legislative history of the 1972 amendments to Title VII which is briefly recounted in the Court's opinion, *ante,* at 73–75. That history is far more instructive than the Court allows. After the EEOC promulgated its second set of guidelines requiring reasonable accommodations unless undue hardship would result, at least two courts issued decisions questioning, whether the guidelines were consistent with Title VII. *Dewey* v. *Reynolds Metals Co.,* 429 F. 2d 324 (CA6 1970),

aff'd by equally divided Court, 402 U. S. 689 (1971); *Riley* v. *Bendix Corp.*, 330 F. Supp. 583 (MD Fla. 1971), rev'd, 464 F. 2d 1113 (CA5 1972). These courts reasoned, in language strikingly similar to today's decision, that to excuse religious observers from neutral work rules would "discriminate against . . . other employees" and "constitute unequal administration of the collective-bargaining agreement." *Dewey* v. *Reynolds Metals Co., supra,* at 330. They therefore refused to equate "religious discrimination with failure to accommodate." 429 F. 2d, at 335. When Congress was reviewing Title VII in 1972, Senator Jennings Randolph informed the Congress of these decisions which, he said, had "clouded" the meaning of religious discrimination. 118 Cong. Rec. 706 (1972). He introduced an amendment, tracking the language of the EEOC regulation, to make clear that Title VII requires religious accommodation, even though unequal treatment would result. The primary purpose of the amendment, he explained, was to protect Saturday Sabbatarians like himself from employers who refuse "to hire or to continue in employment employees whose religious practices rigidly require them to abstain from work in the nature of hire on particular days." *Id.,* at 705. His amendment was unanimously approved by the Senate on a roll-call vote, *id.,* at 731, and was accepted by the Conference Committee, H. R. Rep. No. 92–899, p. 15 (1972); S. Rep. No. 92–681, p. 15 (1972), whose report was approved by both Houses, 118 Cong. Rec. 7169, 7573 (1972). Yet the Court today, in rejecting any accommodation that involves preferential treatment, follows the *Dewey* decision in direct contravention of congressional intent.

The Court's interpretation of the statute, by effectively nullifying it, has the singular advantage of making consideration of petitioners' constitutional challenge unnecessary. The Court does not even rationalize its construction on this ground, however, nor could it, since "resort to an alternative construction to avoid deciding a constitutional question is appro-

priate only when such a course is 'fairly possible' or when the statute provides a 'fair alternative' construction." *Swain* v. *Pressley,* 430 U. S. 372, 378 n. 11 (1977). Moreover, while important constitutional questions would be posed by interpreting the law to compel employers (or fellow employees) to incur substantial costs to aid the religious observer,[3] not all accommodations are costly, and the constitutionality of the statute is not placed in serious doubt simply because it sometimes requires an exemption from a work rule. Indeed, this Court has repeatedly found no Establishment Clause problems in exempting religious observers from state-imposed duties, *e. g., Wisconsin* v. *Yoder,* 406 U. S. 205, 234–235, n. 22 (1972); *Sherbert* v. *Verner,* 374 U. S. 398, 409 (1963); *Zorach* v. *Clauson,* 343 U. S. 306 (1952), even when the exemption was in no way compelled by the Free Exercise Clause, *e. g., Gillette* v. *United States,* 401 U. S. 437 (1971); *Welsh* v. *United States,* 398 U. S. 333, 371–372 (1970) (WHITE, J., dissenting); *Sherbert* v. *Verner, supra,* at 422 (Harlan, J., dissenting); *Braunfeld* v. *Brown,* 366 U. S. 599, 608 (1961) (dictum); *McGowan* v. *Maryland,* 366 U. S. 420, 520 (1961) (opinion of Frankfurter, J.).[4] If the State does not establish

---

[3] Because of the view I take of the facts, see Part II, *infra,* I find it unnecessary to decide how much cost an employer must bear before he incurs "undue hardship." I also leave for another day the merits of any constitutional objections that could be raised if the law were construed to require employers (or employees) to assume significant costs in accommodating.

[4] The exemption here, like those we have upheld, can be claimed by any religious practitioner, a term that the EEOC has sensibly defined to include atheists, *e. g ,* CCH EEOC Decisions (1973) ¶ 6316, see also *Young* v. *Southwestern Savings & Loan Assn.,* 509 F. 2d 140 (CA5 1975), and persons not belonging to any organized sect but who hold " '[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption,' " CCH Employment Practices ¶ 6500, quoting *United States* v. *Seeger,* 380 U. S. 163, 176 (1965). The purpose and primary effect of requiring such exemptions is the wholly secular one of securing

religion over nonreligion by excusing religious practitioners from obligations owed the State, I do not see how the State can be said to establish religion by requiring employers to do the same with respect to obligations owed the employer. Thus, I think it beyond dispute that the Act does—and, consistently with the First Amendment, can—require employers to grant privileges to religious observers as part of the accommodation process.

## II

Once it is determined that the duty to accommodate sometimes requires that an employee be exempted from an otherwise valid work requirement, the only remaining question is whether this is such a case: Did TWA prove that it exhausted all reasonable accommodations, and that the only remaining alternatives would have caused undue hardship on TWA's business? To pose the question is to answer it, for all that the District Court found TWA had done to accommodate respondent's Sabbath observance was that it "held several meetings with [respondent] . . . [and] authorized the union steward to search for someone who would swap shifts." 375 F. Supp. 877, 890–891 (WD Mo. 1974). To conclude that TWA, one of the largest air carriers in the Nation, would have suffered undue hardship had it done anything more defies both reason and common sense.

The Court implicitly assumes that the only means of accommodation open to TWA were to compel an unwilling employee to replace Hardison; to pay premium wages to a voluntary substitute; or to employ one less person during

equal economic opportunity to members of minority religions. Cf., *e. g.,* *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971). And the mere fact that the law sometimes requires special treatment of religious practitioners does not present the dangers of "sponsorship, financial support, and active involvement of the sovereign in religious activity," against which the Establishment Clause is principally aimed, *Walz* v. *Tax Comm'n,* 397 U. S. 664, 668 (1970).

respondent's Sabbath shift.[5]    Based on this assumption, the Court seemingly finds that each alternative would have involved undue hardship not only because Hardison would have been given a special privilege, but also because either another employee would have been deprived of rights under the collective-bargaining agreement, *ante,* at 80–81, or because "more than a *de minimis* cost," *ante,* at 84, would have been imposed on TWA.    But the Court's myopic view of the available options is not supported by either the District Court's findings or the evidence adduced at trial.    Thus, the Court's conclusion cannot withstand analysis, even assuming that its rejection of the alternatives it does discuss is justifiable.[6]

---

[5] It is true that these are the only options the Court of Appeals discussed.    But that court found that TWA could have adopted these options without undue hardship; once that conclusion is rejected it is incumbent on this Court to decide whether any other alternatives were available that would not have involved such hardship.

[6] I entertain grave doubts on both factual and legal grounds about the validity of the Court's rejection of the options it considers.    As a matter of fact, I do not believe the record supports the Court's suggestion that the costs to TWA of either paying overtime 'or not replacing respondent would have been more than *de minimis.*    While the District Court did state, as the Court notes, *ante,* at 84 n. 15, that both alternatives "would. have created an undue burden on the conduct of TWA's business," 375 F. Supp., at 891, the court did not explain its understanding of the phrase "undue burden," and may have believed that such a burden exists whenever any cost is incurred by the employer, .no matter how slight.    Thus the District Court's assertion falls far short of a factual "finding" that the costs of these accommodations would be more than *de minimis.*    Moreover, the record is devoid of any evidence documenting the extent of the "efficiency loss" TWA would have incurred had it used a supervisor or an already scheduled employee to do respondent's work, and while the stipulations make clear what overtime would have cost, the price is far from staggering: $150 for three months, at which time respondent would have been eligible to transfer back to his previous department. The Court's suggestion that the cost of accommodation must be evaluated in light of the "likelihood that . . . TWA may have many employees whose religious observances . . . prohibit them from working on Satur-

To begin with, the record simply does not support the Court's assertion, made without accompanying citations, that "[t]here were no volunteers to relieve Hardison on Saturdays," *ante,* at 81. Everett Kussman, the manager of the department in which respondent worked, testified that he had made no effort to find volunteers, App. 136,[7] and the union stipulated that its steward had not done so either, *id.,* at 158.[8] Thus, contrary to the Court's assumption, there may have been one or more employees who, for reasons of either sympathy or personal convenience, willingly would have substi-

---

days or Sundays," *ante* at 84 n. 15, is not only contrary to the record, which indicates that only one other case involving a conflict between work schedules and Sabbath observance had arisen at TWA since 1945, Tr. 312–314, but also irrelevant, since the real question is not whether such employees exist but whether they could be accommodated without significant expense. Indeed, to the extent that TWA employed Sunday as well as Saturday Sabbatarians, the likelihood of accommodation being costly would diminish, since trades would be more feasible.

As a matter of law, I seriously question whether simple English usage permits "undue hardship" to be interpreted to mean "more than *de minimis* cost," especially when the examples the guidelines give of possible undue hardship is the absence of a qualified substitute, *supra,* at 85–86. I therefore believe that in the appropriate case we would be compelled to confront the constitutionality of requiring employers to bear more than *de minimis* costs. The issue need not be faced here, however, since an almost cost-free accommodation was possible.

[7] Wilbur Stone, Director of Industrial Relations, Technical Service, at TWA confirmed Kussman's testimony. App. 157–158. In its Response to Plaintiff's Suggested Findings of Fact, TWA conceded that it "did not attempt to find a replacement for plaintiff." App. in No. 74–1424 (CA6), p. 191, ¶ 3 (1).

[8] The Court relies, *ante,* at 78, on the District Court's conclusory assertion that "[a]ny shift or change was impossible within the seniority framework." 375 F. Supp., at 889. But the District Court also found that "TWA did not take part in the search for employees willing to swap shifts . . . and it was admitted at trial that the Union made no real effort." *Id.,* at 888. Thus, the District Court's statement concerning the impact of "the seniority framework" lends no support to the Court's assertion that there were no volunteers. See also n. 10, *infra.*

tuted for respondent on Saturdays until respondent could either regain the non-Saturday shift he had held for the three preceding months[9] or transfer back to his old department where he had sufficient seniority to avoid Saturday work. Alternatively, there may have been an employee who preferred respondent's Thursday-Monday daytime shift to his own; in fact, respondent testified that he had informed Kussman and the union steward that the clerk on the Sunday-Thursday night shift (the "graveyard" shift) was dissatisfied with his hours. *Id.*, at 70. Thus, respondent's religious observance might have been accommodated by a simple trade of days or shifts without necessarily depriving any employee of his or her contractual rights[10] and without

---

[9] Respondent lost the non-Sabbath shift when an employee junior to him went on vacation. The vacation was to last only two weeks, however, and the record does not explain why respondent did not regain his shift at the end of that time.

[10] If, as appears likely, no one senior to the substitute employee desired respondent's Sabbath assignment or his Thursday-Monday shift, then the substitute could have transferred to respondent's position without depriving anyone of his or her seniority expectations. Similarly, if, as also appears probable, no one senior to respondent desired the substitute's spot, respondent could have assumed it. Such a trade would not have deprived any employee of seniority expectations. The trade apparently still would have violated the collective-bargaining agreement, however, since the agreement authorized transfers only to vacant jobs. This is undoubtedly what the District Court meant when it found that "the seniority framework" precluded shift changes. See n. 8, *supra.* Indeed, the first time in the District Court's opinion that such a finding appears, it is preceded by the finding that "there were no jobs open for bid." 375 F. Supp., at 884.

Even if a trade could not have been arranged without disrupting seniority expectations TWA could have requested the Union Relief Committee to approve an exemption. The record reveals that the Committee's function was to ameliorate the rigidity of the system, App. 130, and that on at least one occasion it had approved a permanent transfer apparently outside the seniority system, *id.*, at 144.

imposing significant costs on TWA. Of course, it is also possible that no trade—or none consistent with the seniority system—could have been arranged. But the burden under the EEOC regulation is on TWA to establish that a reasonable accommodation was not possible. 29 CFR § 1605.1 (c) (1976). Because it failed either to explore the possibility of a voluntary trade or to assure that its delegate, the union steward, did so, TWA was unable to meet its burden.

Nor was a voluntary trade the only option open to TWA that the Court ignores; to the contrary, at least two other options are apparent from the record. First, TWA could have paid overtime to a voluntary replacement for respondent—assuming that someone would have been willing to work Saturdays for premium pay—and passed on the cost to respondent. In fact, one accommodation Hardison suggested would have done just that by requiring Hardison to work overtime when needed at regular pay. Under this plan, the total overtime cost to the employer—and the total number of overtime hours available for other employees—would not have reflected Hardison's Sabbath absences. Alternatively, TWA could have transferred respondent back to his previous department where he had accumulated substantial seniority, as respondent also suggested.[11] Admittedly, both options would have violated the collective-bargaining agreement; the former because the agreement required that employees working over 40 hours per week receive premium pay, and the latter because the agreement prohibited employees from trans-

---

[11] The Court states, *ante*, at 83 n. 14, that because of TWA's departmental seniority system, such a transfer "would not have solved Hardison's problems." But respondent testified without contradiction that had he returned to his previous department he would have regained his seniority in that department, and thereby could have avoided work on his Sabbath. App. 70–71. According to respondent, the only objection that was raised to this solution was that it violated the rule prohibiting transfers twice within six months. *Ibid.*

ferring departments more than once every six months. But neither accommodation would have deprived any other employee of rights under the contract or violated the seniority system in any way.[12] Plainly an employer cannot avoid his duty to accommodate by signing a contract that precludes all reasonable accommodations; even the Court appears to concede as much, *ante,* at 79. Thus I do not believe it can be even seriously argued that TWA would have suffered "undue hardship" to its business had it required respondent to pay the extra costs of his replacement, or had it transferred respondent to his former department.[13]

What makes today's decision most tragic, however, is not that respondent Hardison has been needlessly deprived of his livelihood simply because he chose to follow the dictates of his conscience. Nor is the tragedy exhausted by the impact it will have on thousands of Americans like Hardison who could be forced to live on welfare as the price they must pay for

---

[12] The accommodations would have disadvantaged respondent to some extent, but since he suggested both options I do not consider whether an employer would satisfy his duty to accommodate by offering these choices to an unwilling employee. Cf. *Draper* v. *United States Pipe & Foundry Co.,* 527 F. 2d 515 (CA6 1975) (employer does not discharge his duty to accommodate by offering to transfer an electrician to an unskilled position).

[13] Of course, the accommodations discussed in the text would have imposed some administrative inconvenience on TWA. Petitioners do not seriously argue, however, that this consequence of accommodation makes the statute violative of the Establishment Clause. Were such an argument to be made, our prior decision upholding exemptions from state-created duties, see *supra,* at 90, would provide a complete answer, since the exemptions we have sustained have placed not inconsiderable burdens on private parties. For example, the effect of excusing conscientious objectors from military conscription is to require a nonobjector to serve instead, yet we have repeatedly upheld this exemption. *E. g., Selective Draft Law Cases,* 245 U. S. 366, 389–390 (1918). See also *Gallagher* v. *Crown Kosher Market,* 366 U. S. 617, 627 (1961) (upholding law prohibiting private citizens from engaging in specified activities within a fixed distance from places of public worship).

worshiping their God.[14]  The ultimate tragedy is that despite Congress' best efforts, one of this Nation's pillars of strength—our hospitality to religious diversity—has been seriously eroded.  All Americans will be a little poorer until today's decision is erased.

I respectfully dissent.

---

[14] Ironically, the fiscal costs to society of today's decision may exceed the costs that would accrue if employers were required to make all accommodations without regard to hardship, since it is clear that persons on welfare cannot be denied benefits because they refuse to take jobs that would prevent them from observing religious holy days, see *Sherbert* v. *Verner*, 374 U. S. 398 (1963).