McKEAGUE, Circuit Judge,
dissenting.
I would affirm the district court because, upon viewing the record in the light most favorable to Crider, the University’s Programs Abroad Office was entitled to summary judgment as a matter of law. Accordingly, I respectfully dissent.
A thorough consideration of the undisputed record reveals that the University is entitled to summary judgement. The Programs Abroad Office at the University is charged with overseeing nearly 1,000 students studying abroad in approximately 35 countries. The supervisor of the Programs Abroad Office, Dr. Wood, was hired in 2007 shortly after a student studying abroad in France unexpectedly died. Recognizing that the trauma of this tragedy was amplified by faculty and University confusion over how to best react in a crisis situation, Dr. Wood implemented new emergency procedures for students and faculty abroad.
The centerpiece of the new emergency procedures was an emergency cell phone (the “emergency phone”), which created a single point of contact in an emergency. Dr. Wood assigned responsibility for the emergency phone to the Programs Abroad Office’s Coordinators after determining they were the only staff members with sufficient expertise and training. At the time Dr. Wood instituted the emergency phone program in March 2008, the Programs Abroad Office had three Coordinator positions. Meador and Rost held two of the positions and the third job remained vacant until Crider was hired in May 2008.
Dr. Wood made clear that her “assumption was that the [Programs Abroad Office] would be staffed with three exempt coordinators.” Indeed, she believed that “having only two Coordinators carrying the phone on an ongoing basis constituted an unacceptable risk to our students and faculty.” Dr. Wood anticipated that emergencies may require more than one Coordinator to resolve, thereby creating a precarious situation given the fact that the Coordinators travel frequently for work and “when one was traveling, the other had responsibility for the phone with no backup in the event of a personal emergency or family crisis.” Crider does not July 19, 2012 dispute these facts.
Dr. Wood also “recognized that carrying the phone was an onerous burden to assume so frequently. Coordinators must keep the phones with them at all times, including weekends, and must remain in an environment where they can hear and respond immediately to a call.” Coordinators are required to monitor the phone for seven day shifts from Monday to Monday. Moreover, Coordinators are required to stay in Knoxville while they are carrying the phone so they could access files in the Programs Abroad Office in the event of an emergency. The demands of the emer *617 gency phone thereby effectively deprived Meador and Rost of every other weekend until a third Coordinator could be found. As both Meador and Rost made clear, this was extremely burdensome, especially since they wanted to leave town on the weekends to visit family.
Given both the safety and the staffing issues resulting from having only two Coordinators to manage the emergency phone, the Programs Abroad Office continued to search for a third Coordinator. When Crider was interviewed, Dr. Wood told her that weekend work was required. At no point in the interview did Crider indicate that she would be unable to work on the weekends. Crider was offered the position and she accepted. On her fourth day as Coordinator, Crider informed the Programs Abroad Office that she was a Seventh-Day Adventist and that her religious beliefs precluded her from working on her Sabbath. Crider refused to perform any work, including participating in the emergency phone rotation, from sundown Friday to sundown Saturday.
For nearly one month both the Programs Abroad Office and the University explored possible means to accommodate Crider. Crider proposed an alternate emergency phone schedule that shifted her Saturday responsibilities to Meador and Rost. Dr. Wood met with Meador and Crost to ask if they were willing to accept Crider’s proposal, and both Meador and Crost stated that they would not voluntarily agree to adjust shifts because it would permanently and unacceptably compromise their weekends. Dr. Wood also met with Crider and posed at least three scenarios in an attempt to accommodate her: (1) Dr. Wood asked Crider if she would be willing to carry the phone if the other Coordinators were out of town; (2) Dr. Wood asked the plaintiff if she would carry the phone if one Coordinator was out of town and the other Coordinator had a family crisis; and (3) Dr. Wood asked Cri-der if she would be willing to assist the other Coordinators in an emergency situation. Crider refused all three proposals. After meeting with Crider to fully explore the parameters of her religious limitations, Dr. Wood determined that Crider could not be accommodated. During this entire period, Meador and Rost continued to monitor the phone on alternating weekends just as they had prior to Crider’s employment.
Under these circumstances, accommodating Crider’s religious needs was an undue hardship. Title VII only requires an employer to offer employees a “reasonable accommodation” if doing so would not create an undue hardship. See 42 U.S.C. § 2000e(j). Title VII was not intended to force employers to “bear more than a de minimis cost” in accommodating employees. Hardison, 432 U.S. at 81, 97 S.Ct. 2264. Indeed, an employer is not required to suffer a chaotic personnel problem in order to be in compliance with Title VII. See Draper, 527 F.2d at 520. Rather, “the mere possibility of an adverse impact on co-workers ... is sufficient to constitute an undue hardship.” Virts v. Consol. Freightways Corp., 285 F.3d 508, 520-21 (6th Cir.2002) (applying Hardison). Further, an employer’s neutral decisions, such as shift scheduling, are protected under Title VII. Id. at 82, 97 S.Ct. 2264. This is true even if such decisions result in “discriminatory consequences.” Id. at 82, 97 S.Ct. 2264.
There is no evidence in the record that Crider’s termination was anything other than a neutral employment decision based on her inability to perform the core requirements of her position. The emergency phone rotation was instituted well before Crider was hired and the record reveals that the Programs Abroad Office viewed deviations from this program as a *618 threat to its ability to effectively handle emergencies. Accordingly — whether Cri-der’s accommodation is viewed from a financial or structural perspective — it would have imposed far more than a de mini-mus burden on the Programs Abroad Office. Title VII does not call for such a result. Hardison, 432 U.S. at 81, 97 S.Ct. 2264.
The majority wrongly attributes the Programs Abroad Office’s inability to accommodate Crider to employee “grumbling.” The small number of qualified staff in the Programs Abroad Office meant that accommodating Crider’s religious practices would have gone well beyond the “mere possibility” of adversely impacting Meador and Rost. The burden on them was not a metaphysical concern with uncertain consequences: Meador and Crost had already experienced the burdens of managing the emergency phone every other weekend for a sustained period of time and they did not want that arrangement to become permanent. As Meador and Rost emphasized, this would significantly impact their personal lives. This is legally sufficient to constitute an undue burden under Title VII. See Virts, 285 F.3d at 520-21.
Furthermore, the majority’s approach toward Meador and Rost is disconcerting because “Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities.” Hardison, 432 U.S. at 81, 97 S.Ct. 2264. If the Programs Abroad Office had forced Crider’s coworkers to involuntarily assume part of Crider’s emergency phone responsibilities because of Crider’s religious beliefs, the effect would be discrimination against Meador and Rost in violation of Title VII. See id.
Finally, the majority erroneously concludes that the record contains an issue of material fact as to whether the Programs Abroad Office frustrated Crider’s request for accommodation. The majority cites to McGuire for the proposition that “[s]um-mary judgment is inappropriate when there is a question as to whether the employer inhibited, frustrated or impeded volunteers from swapping shifts.” See McGuire v. General Motors Corp., 956 F.2d 607 (6th Cir.1992). In McGuire, however, the employee started a voluntary shift-swap scheme that “had been operating with at least some degree of success” until the employer intervened and made it “ ‘virtually impossible’ ” for the scheme to continue. Id. at 610.
That is not the case here. First, there was no preexisting employee-generated shift-swap scheme at the Programs Abroad Office. Instead, Meador and Rost were never amenable to voluntarily giving up at least part of every other weekend— they both told Dr. Wood they were unwilling to accept such an arrangement, and Meador even threatened to quit. Second, there is no evidence that the Programs Abroad Office rendered it “virtually impossible” for Crider to obtain accommodation from her coworkers. For this point, the majority relies solely on Dr. Wood’s instruction to Meador and Rost to not do anything different at work. Yet the record does not show that this instruction contributed to Meador’s and Rost’s decision to not accept Crider’s proposed shift change (or even that it occurred prior to them informing Dr. Wood of their decision). Instead, it shows that their unwillingness to permanently sacrifice their weekends was already independently established.
In any event, any comment made by Dr. Wood was irrelevant since it was unreasonable for the Programs Abroad Office to *619 grant Crider’s proposed accommodation. The record establishes that the emergency phone program was integral to the Programs Abroad Office and Dr. Wood deemed it unsustainable to have only two coordinators handle the emergency phone program. Adding a third coordinator was one of the very reasons Crider was hired. Title VII does not require the University to make the Hobson’s choice of either restructuring its entire operation or jeopardizing the wellbeing of its employees, students, and faculty.
The record, viewed in a light most favorable to Crider, reveals that the University met its burden. Not only did the University offer Crider multiple accommodations, but the University also demonstrated that Crider’s recalcitrance would both create an undue burden for her co-workers and threaten the ability of the Program Abroad Office to handle an emergency. These are not in dispute. The record also reflects that Crider was uncooperative at every turn, thus failing to satisfy her burden under Title VII. See Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir.1987) (noting that an employee “must make some effort to cooperate with an employer’s attempt at accommodation).” Accordingly, the University met its Title VII burden and summary judgment is proper.
For the foregoing reasons, I respectfully dissent.