Milton E. HUSTON, Appellant
(Cross-Appellee),

v.

LOCAL NO. 93, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (U.A. W.), Appellee (Cross-Appellant).

Nos. 76–1248 and 76–1293.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 8, 1976.

Decided July 19, 1977.

J. D. Riffel, The Legal Aid & Defender Society of Greater Kansas City, Inc. (argued), and Samuel I. McHenry, Kansas City, Mo., on brief, for appellant.

James E. Youngdahl, Little Rock, Ark. (argued), and C. David Whipple, Kansas City, Mo., on brief, for appellee.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

GIBSON, Chief Judge.

Plaintiff, Milton Huston, appeals from a judgment of the District Court[1] in favor of defendant, Local No. 93, U.A.W. Plaintiff's suit was brought under Title VII of the Civil Rights Act of 1964. The District Court entered judgment for the defendant.

Plaintiff-appellant Milton Huston was an assembly line employee at the General Motors Assembly Plant at Leeds, Missouri, from September 15, 1967, until February 7, 1972. Throughout his employment he was a member of Local 93 of the U.A.W., which represented production and maintenance employees at the plant. In 1969, Huston became interested in the World Wide Church of God, a religion teaching that it is a capital sin to work on the Sabbath, which under that church's tenets extends from sunset Friday until sunset Saturday. In October 1969, Huston began to observe the Sabbath according to the teachings of the World Wide Church and he continued to so observe the Sabbath throughout the remainder of his employment at the Leeds Plant.

GM provided two daily work shifts for assembly line employees, Monday through Friday: the first shift extended from either 6:00 a. m. to 2:30 p. m. or 6:30 a. m. to 3:00 p. m. and the second from either 4:00 p. m. until 12:30 a. m. or 4:30 p. m. until 1:00 a. m.[2] The Shift Preference Agreement, which was incorporated into the collective bargaining agreement between the Union and GM, made seniority the basis for shift assignment. The first or daytime shift was generally preferred by those employees with sufficient seniority to choose shifts. Thus, less senior employees were usually assigned to the second shift.

In October 1969, when Huston began to observe the World Wide Church Sabbath, he lacked seniority for the first shift and was, therefore, working the second shift from 4:00 p. m. until 12:30 a. m., Monday through Friday. Insofar as the second shift extended beyond sunset on Fridays, it conflicted with the World Wide Church designation of the Sabbath. In October 1969, Huston began to miss Friday work assignments because of their conflict with his

---

1. The Honorable William R. Collinson, United States District Judge for the Western District of Missouri.

2. Assembly line employees were never required to work on Sundays. There were occasional assignments of overtime on Saturdays.

observance of the Sabbath. Beginning on October 3, 1969, Huston was absent from work on six successive Fridays. On October 28, 1969, Huston received his first discipline from GM relative to his Friday absences. He was issued a written reprimand for having been absent without reasonable cause on the previous Friday. On November 3, 1969, Huston was assessed a very short disciplinary lay-off for his continuing unexcused Friday absences. Huston filed grievances in response to both disciplines, arguing that his absences should be excused because his religious beliefs prohibited him from working after sunset on Fridays. GM and the Union disposed of both grievances by agreeing that Huston's record would be cleared of the disciplines if there were no further violations in the next six months.

GM assigned Huston to the first shift beginning on November 21, 1969, despite his lack of requisite seniority. This transfer, which was violative of the Shift Preference Agreement and the collective bargaining agreement, was made at the request of the Union. The working hours for the first shift did not interfere with Huston's observance of the Sabbath, but his transfer disgruntled certain second shift employees with greater seniority than Huston's. Their "grumbling" and complaints caused the Union to request that GM reassign Huston to the second shift. GM complied with this request and Huston was reassigned to the second shift effective January 5, 1970. He was thereafter absent from work on

every Friday through March 27, 1970. He received four disciplinary lay-offs in consequence of these various absences. Huston filed grievances relative to all four disciplines. The Union appealed the decisions of management on two of these grievances. However, none of the grievances ever proceeded to arbitration, which was the final step in dispute settlement under the collective bargaining agreement.

Around April 1, 1970, there was a general plant lay-off. When Huston returned to work following the lay-off, he was assigned to the first shift. He remained on the first shift until January 31, 1972, at which time he was transferred back to the second shift. Huston was absent from work on February 4, 1972, his first Friday back on the second shift. As a result of this absence, Huston was discharged by GM on February 7, 1972.[3]

On April 12, 1972, Huston brought suit against GM under Title VII of the 1964 Civil Rights Act. He alleged that GM had violated 42 U.S.C. § 2000e *et seq.* (1970), *as amended*, (Supp. V 1975) by suspending and discharging him for his refusal for religious reasons to work Friday evenings. On November 1, 1973, a first amended complaint was filed which added the Union as a party defendant.[4] Plaintiff alleged that the Union had participated and acquiesced in the employer's unlawful employment practices. A December 3, 1975, trial date was set. On the eve of trial, Huston and GM reached a settlement whereunder Huston withdrew

---

**3.** This case is complicated somewhat by the fact that in mid-August 1970, Lehman Brown, another employee at the Leeds plant who was a member of the World Wide Church, was discharged for refusing to work the second shift on Fridays. A grievance was filed and his case eventually went to arbitration. In a decision rendered on October 5, 1971, the umpire upheld the discharge and held that GM was not required to excuse employees from the second shift on Friday evenings because of conflicts between the working hours and their exercise of religious beliefs. Because of the great similarity between Huston's and Brown's cases, certain of Huston's grievances were held in abeyance pending the umpire's decision. Moreover, the Union apparently deemed the umpire's decision in Brown's case dispositive of Huston's case and chose not to take the

"futile" step of appealing Huston's grievances or discharge to the umpire for arbitration. Finally, while the record shows that the Union made a variety of accommodation proposals to GM aimed at solving Brown's and Huston's problems, it does not delineate which proposals, if any, were urged only with regard to Brown. The identity of Brown's and Huston's situations, when coupled with the narrow time span within which they occurred, renders any such delineation unnecessary under the circumstances of this case.

**4.** Prior to the filing of Huston's amended complaint, his case came before this court on a procedural issue unrelated to the merits of the present appeal. See *Huston v. General Motors Corp.*, 477 F.2d 1003 (8th Cir. 1973).

**480**

any claim for reinstatement, injunctive relief or costs from GM in exchange for a payment of $9,000 from GM. Huston thus elected to proceed against the Union alone and the case proceeded to trial. On February 24, 1976, the trial court entered judgment in favor of the Union. Huston appeals on the merits and the Union cross-appeals on the denial of attorney fees at trial and requests an award of attorney fees on appeal.

42 U.S.C. § 2000e-2(a)(1) makes it an unlawful employment practice for an employer to discriminate against an employee on the basis of his religion. This provision must be read in conjunction with the definition of religion provided by the 1972 amendment to Title VII.[5]

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

42 U.S.C. § 2000e-2(c) makes it an unlawful employment practice for a labor organization to discriminate against any individual because of his religion or to cause or attempt to cause an employer to discriminate against an individual because of his religion.

■ Plaintiff Huston contends that GM attempted a reasonable accommodation; that the Union obstructed this attempt; and that this obstruction constituted an unlawful practice under Title VII. It is apparent that both the Union and the employer made certain attempts to accommodate Huston's religious beliefs and that his beliefs were accommodated until valid complaints were received from other Union members who possessed seniority rights greater than Huston's. Given the postulate of a seniority system, a statutory obligation to accommodate religious needs does not supersede the contractual seniority rights of other employees. Huston was not discriminated against, for he was afforded the same rights as other employees with respect to shift preferences. The employer itself could not take steps, without violating the collective bargaining contract, to grant Huston a preference in the seniority structure.

■ While the Union could perhaps give consent to a variance if it met with the approval of its affected members, it certainly could not vary the seniority provisions of the collective bargaining agreement in disregard of the contractual rights of employees who wished to be afforded the benefits of their seniority.[6] As expressed in *Trans World Airlines, Inc. v. Hardison,* —— U.S. ——, ——, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977):

> Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities. * * * It would be anomalous to conclude that by "reasonable accommodation" Congress

---

5. For an overview of the evolution of this provision, see *Trans World Airlines, Inc. v. Hardison,* —— U.S. ——, —— – ——, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

6. The trial court found that if an exception in the shift preference provisions of the collective bargaining agreement had been made in order to enable Huston to work the day shift, he would have "skipped" over a large number of employees in the night shift who were senior to him. Huston contends that this finding is erroneous. He does not contend that he would not have skipped over more senior employees, but that such skipping had been condoned on previous occasions when employees were faced with personal emergencies. Nevertheless, Huston's permanent transfer to the day shift would have skipped him over employees with more seniority and deprived them of their contractual rights under the collective bargaining agreement. Thus, the trial court's findings on this issue are fully supported by the record. Moreover, we note that the existence of a temporary emergency shift variance procedure in *Trans World Airlines, Inc. v. Hardison, supra,* did not excuse a derogation of contract rights by means of a permanent transfer in violation of seniority provisions.

meant that an employer must deny the shift and job preferences of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

It would be even more anomalous to require a union to do that which is not required of the employer: modify seniority rules in derogation of the contractual rights of its members. The Union had no duty to modify the seniority provisions of the collective bargaining agreement under the facts of this case and its refusal to do so neither constituted discrimination against Huston nor caused such discrimination by GM.[7]

■■■ The Union's request for attorney's fees under 42 U.S.C. § 2000e-5(k) was denied by the trial court. We deem this denial to have been well within the discretion imparted to the trial court by that statute. The Union also requests an award of costs on appeal, including attorney's fees, under both Title VII and 28 U.S.C. § 1912. We do not consider this an appropriate case for an award of attorney's fees to the Union under either 42 U.S.C. § 2000e-5(k) or 28 U.S.C. § 1912. Accordingly, the Union's request for an award of attorney's fees on appeal is denied.

The judgment of the District Court is affirmed, and statutory costs are assessed against appellant.

---

**7.** Huston also contends that the Union had a duty to do more than merely satisfy the duty of fair representation. He concedes that the duty of fair representation was met. We do not deem it necessary at this juncture to address the question of whether, and if so, how the Union's duties under 42 U.S.C. § 2000e-2(c) differ from its duty of fair representation. The duty of fair representation was concededly met and the Union acquitted itself of its responsibilities under Title VII. No further inquiry is necessary here.