**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**ARLINGTON TRANSIT MIX INC. and Arlington Masonry Supply Company, Defendants.**

Civ. No. 89 CV 70089 DT.

United States District Court, E.D. Michigan, S.D.

April 12, 1990.

John H. Edmonds, David Ingram, Karen A. Khan and Mimi M. Gendreau, Detroit, Mich., for plaintiff.

Eric G. Flinn, Sterling Heights, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff, the United States Equal Employment Opportunity Commission (EEOC), has filed this action against defendants Arlington Transit Mix Inc. and Arlington Masonry Supply Co. (Arlington), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–5(f). Plaintiff claims that Arlington discriminated against its employee, Neil Taylor, on the basis of his Fundamentalist Baptist religion when it discharged him for leaving work early, contrary to instructions, on Wednesday, July 8, 1987. Mr. Taylor found it necessary to leave in order to attend church services at which he believed the Bible mandated attendance. The matter has been tried by the court without a jury, and this memorandum constitutes the findings of fact and conclusions of law of the court.

Neil Taylor began his employment as a mechanic with Arlington Transit Mix, Inc. in June, 1985. When hired, he informed defendants' Plant Manager, Kenneth Abraham Sr., that he would need to leave early on Wednesdays to attend church services, and he was allowed to do so from June 1985 until the occasion here in litigation, July 8, 1987, a period of about two years.

Defendants employed four mechanics: Mr. Taylor, Dana Justice, Charles Belcher and Lee Roy Cox. During the two year period in which Taylor was permitted to leave early on Wednesdays, all four mechanics had the same starting times and all stayed overtime until all trucks were repaired, often until midnight.

Defendants are a concrete ready-mix company and a dealer in packaged mortar and cement products. They own about fifteen trucks, many of which are large cement mixers which mix concrete and deliver it to job sites of customers engaged in construction projects. Because the trucks are on the road much of the day, repairs and adjustments are often needed when they return to defendants' shop at the end of the day. It is necessary, because of this trucking activity, for defendants to employ four full time mechanics. When the trucks returned from the various job sites, it was important that they be inspected and repaired, if necessary, so that they could go out to other job sites early the next morning. On occasion, the trucks break down away from the garage, and it is then necessary for one of the mechanics to drive out in a service truck and either repair the truck on-site or at least enable it to return to defendants' shop for repairs.

In the spring of 1987, Arlington's management became concerned over the amount of overtime paid to its mechanics and decided to stagger their hours to maximize straight time coverage. Mechanic Charles Belcher was appointed working foreman of mechanics, to more closely supervise their work than Plant Manager Abraham had been able to do from the dispatch office. Belcher was called upon to implement a decision to start two of the four mechanics at 6:00 a.m. each day, and two at 9:00 or 10:00. Those who started at 6:00 would leave at approximately 3:00 p.m., and the late starters would leave

when the last truck had returned and all trucks were fit for the next day. The plan operated loosely, and occasionally the early shift had to return to assist in the evening, or major repairs were left undone until the morning shift arrived. One rule was strictly followed: one mechanic never worked alone. This was for reasons of safety, and also because mechanics would called upon to leave the garage to attend to road service.

Belcher testified that the mechanics were all listed on the union seniority board. Some, but not all were union members, although all truck drivers were and some mechanics were also truck drivers. He testified that the company observed seniority with its non-union as well as with its union mechanics and drivers. Belcher therefore consulted the seniority board in organizing the new schedule. Although he would have preferred to take the early shift himself, he saw that mechanics Michael Cox and Dana Justice had greatest seniority and gave them first choice. They chose the early shift, which meant that Belcher and Taylor had to work from 10:00 A.M. until closing.

At about the time that these new shifts were created, an incident occurred involving a Playboy magazine centerfold, a calendar, and other similar photographs which mechanic Cox had posted in the garage. These items depicted scantily-clad women, which offended Mr. Taylor, and he ripped the calendar off the wall, tore it up and threw it away. Photographs were also removed from a men's room wall and Mr. Taylor acknowledged that he had removed those as well. Mr. Cox was angered that his property had been removed and destroyed, and Plant Manager Abraham reprimanded Taylor for his actions. Taylor admitted that he tore the items down and Abraham requested that he never destroy anyone's property again. Abraham had previously allowed Taylor to post notice of a Bible study group meeting in the garage area. He had also allowed Taylor to distribute religious literature to his fellow employees, when they requested it. Taylor read his Bible during lunch breaks, discussed it with coworkers, and was never

stopped from so doing, as both he and Abraham testified. Abraham reminded plaintiff of all of this, and said "I wouldn't let anybody touch your Bible, and I don't think you should touch anybody else's personal property."

It was shortly after the calendar incident that the shift changes were implemented. Abraham informed Taylor that he would not be able to continue leaving early on Wednesdays as a matter of course. On Wednesday June 1, 1987, however, the first Wednesday of the new schedule, Taylor was permitted to leave early because the trucks were all safely back in the garage.

On Wednesday, July 8, Taylor went to the dispatch office at 5:52 and announced that he was leaving for his 7:00 p.m. church service. The trucks were not yet all safely back at the garage, however, and Abraham told Plaintiff not to leave yet. Plaintiff insisted. Abraham told him that he was being foolish and was placing his job in jeopardy. He warned Taylor that if he left, it would be his job. Cox, who was driving the last truck, had already telephoned that he was en route back to the garage and that his truck needed no repairs. Taylor punched out and left despite Abraham's warning. One mechanic was left alone in the garage so Abraham waited with him for the last truck. The next day, when plaintiff arrived at 1:00 P.M. to get his tools, he was handed a letter informing him of his discharge.

█ Arlington first claims that this Court lacks jurisdiction because neither Arlington Transit Mix Inc. nor Arlington Masonry Supply Co. is an employer as that term is defined in Title VII, 42 U.S.C. § 2000e (b):

> ... a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year
> ...

Defendants claim that neither Arlington Transit Mix, Inc. nor Arlington Masonry Supply Company has fifteen or more employees. However, under certain circum-

stances, two entities may be treated as a single employer for Title VII jurisdictional purposes. In *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir.1983), the Sixth Circuit stated that the application of the "single employer" doctrine depended on the interrelationship between the two entities in question. The Court adopted four factors which courts are to consider when deciding whether the doctrine should be applied and they include the degree of:

1) interrelated operations,

2) common management,

3) centralized control of labor relations, and

4) common ownership.

*Id.* at 1337. The Court went on to state that all four factors need not be present for the single employer doctrine to be applicable because the key is that the two entities are "highly integrated with respect to ownership and operation." *Id.* at 1338.

On the basis of the four factors of *Armbruster*, it is clear that Arlington Transit Mix, Inc. and Arlington Masonry Supply Co. are a single employer for Title VII purposes. Barbara Newman is the owner and majority stockholder of both entities. Both companies have the same Board of Directors and Officers. Kenneth Abraham Sr. is the plant manager of both. Both are located at the same address and use the same letterhead. The four mechanics worked on all the trucks used by both entities. Mr. Abraham had traditionally set the schedules for all four mechanics, until he delegated this task to Belcher. Several employees testified that except for the name printed on their paychecks, they were not even sure which entity employed them or their coworkers. One bookkeeper did the accounting for both entities. Clearly, the operations of these two entities were extensively interrelated. Both ownership and management were common and labor relations were centralized. In this case, all four *Armbruster* factors are present. The two entities together employed over fifteen persons. Accordingly, the two are a single employer for Title VII jurisdictional purposes, and this Court had jurisdiction to hear this case.

■ Title VII prohibits religious discrimination by employers. It provides that "It shall be an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Further, 42 U.S.C. § 2000e (j) provides that:

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is *unable to reasonably accommodate an employee's ... religious observance or practice without undue hardship* on the conduct of the employer's business. (Emphasis added).

The initial burden of proof in this lawsuit was on the EEOC to establish a prima facie case of religious discrimination. To do so, it must show that: (1) Taylor had a sincerely held religious belief that he must attend Wednesday evening church services; (2) Arlington was informed that Taylor held this religious belief and that it created a conflict with his job; and (3) Taylor was discharged for pursuit of his religious belief. *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1086 (6th Cir.1987).

The Court finds that the EEOC has met its burden as to all of these elements. The Court is convinced that Mr. Taylor had a sincerely held religious belief that he must attend Wednesday evening church services. Taylor testified at trial that he believes that Hebrew 10:25 of the King James version of the Bible mandated that he attend church services on Sunday and Wednesday evenings, and any other time at which a service may be held. Whether or not Mr. Taylor's church shared his beliefs is not determinative. In 29 C.F.R. § 1605.1 ("Religious" nature of a practice or belief.) the EEOC provides:

the Commission will define religious practices to include moral and ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.... The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will

not determine whether the belief is a religious belief of the employee or prospective employee.

Arlington knew of Taylor's beliefs and of the conflict that they caused. Abraham testified that he believed Mr. Taylor was sincere in his belief that he had to attend Wednesday evening services. The fact that Arlington accommodated Mr. Taylor's beliefs for the entire two years of his employment until this occasion further supports such a finding.

Mr. Taylor was indeed discharged for refusing to work after 5:52 on a Wednesday evening. In a letter to Mr. Taylor, dated July 9, 1987, Mr. Abraham wrote, "On July 8, 1987 you walked out of work after being told you could not be excused, because of repairs that needed to be done. Because of that action, your services are no longer needed." Thus, the Court finds that the three elements of a prima facie case were proven by Plaintiff.

■ With the establishment of the EEOC's prima facie case, the burden shifts to Arlington to show either that it made a reasonable accommodation for Taylor's religious beliefs, or that no reasonable accommodation was possible without undue hardship. *Smith, supra,* at 1085. Arlington showed at trial that it reasonably accommodated Taylor's religious convictions for two years, by regularly allowing him to leave early on Wednesdays. However, after the new schedules became necessary because of excess overtime pay expenses in the spring of 1987, Arlington no longer was able to uniformly accommodate Taylor's request to leave early. Arlington had the burden here of showing that it was unable to do so without undue hardship. Arlington did prove, by a preponderance of the evidence, through its employees who were called as part of Plaintiff's case, that Plaintiff could not have been accommodated without incurring undue hardship on July 8, 1987, the only occasion on which he was not accommodated, and which precipitated Plaintiff's discharge. It is significant that Taylor had been accommodated on July 1, 1987, the first Wednesday of the new

schedule, when the trucks were all safely in the garage in time for him to leave.

The extent of an employer's obligation to accommodate an employee's religious beliefs was addressed by the United States Supreme Court in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In *Hardison,* the plaintiff employee's religious beliefs prevented him from working on Saturdays. A seniority system contained in a collective-bargaining agreement between TWA and the labor union determined who had priority in choosing work shifts. Because the plaintiff lacked seniority, he was unable to get a shift with Saturdays off. The Court of Appeals held that TWA, by rejecting three reasonable alternatives, had failed to reasonably accommodate the plaintiff's religious beliefs. The Supreme Court reversed, holding that each of the proposed alternatives involved an undue hardship to TWA. The first alternative, allowing plaintiff to work a four-day week, would have created a shortage of personnel in other areas. *Id.* at 76, 97 S.Ct. at 2272. The second alternative, filling plaintiff's Saturday shift from other personnel, would have involved premium overtime pay. The Court held that "[t]o require TWA to bear more than a de minimis cost in order to give Hardison Saturdays off is an undue hardship." *Id.* at 84, 97 S.Ct. at 2277. Both a loss of efficiency and premium overtime pay constituted more than de minimis cost. The third alternative, arranging a trade of shifts between plaintiff and another employee, would have involved a breach of the seniority provisions of the collective-bargaining agreement. *Id.* at 76–77, 97 S.Ct. at 2272–73. Moreover, the Court noted that seniority systems are afforded special treatment under Title VII. 42 U.S.C. § 2000e–2(h) provides in part:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate

because of race, color, religion, sex, or national origin....

The Court concluded that "absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Hardison, supra,* at 82, 97 S.Ct. at 2275. Because TWA had no alternatives which did not create an undue hardship, the Court concluded that it had made reasonable efforts to accommodate the plaintiff's religious beliefs. *Id.* at 77, 97 S.Ct. at 2273.

*Hardison* is controlling in this case. The work shifts of Arlington's employees were staggered for a valid economic reason. Requiring Arlington to allow all mechanics to work the same shift would force it to increase the amount of overtime paid. This would constitute more than a de minimis cost and consequently an undue hardship on the business. Moreover, Arlington's seniority system as implemented by Belcher is a bona fide seniority system devoid of any discriminatory intent, and was initially required by the employment of union as well as non-union represented mechanics and mechanic-drivers, together.

The evidence presented at trial shows that deference was given to plaintiff's religious convictions and needs throughout his two years of employment, even after the commencement of two shifts. Although Taylor testified that Abraham told him he did not like his religion, the Court credits Abraham's testimony that he never made such a comment. His conduct toward plaintiff for two years totally belies any such attitude. Abraham permitted Taylor to proselytize coworkers on the job and to denounce all religions other than his, and their adherents, as "hellbound." His only reprimand to Taylor was that Taylor should not have destroyed anyone's property. Abraham bore no animus toward Taylor's religious status whatsoever. The owner of the business, Barbara Newman, had no knowledge of any of these matters or events. Moreover, until July 8, 1987, Taylor had *never once* been denied his demand that he be permitted to leave early Wednesday evenings. Indeed, he routinely left early enough to shower, dress, eat dinner, and to then attend church at 7:00 P.M.

Arlington's drivers were represented by the Teamsters union, and worked pursuant to a collective bargaining agreement which required the maintenance of a seniority board. However, it is not unreasonable for an employer to allot benefits, assignments, shifts, or overtime opportunities by seniority among its employees whether required to do so by union contract or not. Seniority is a universally accepted mode of ranking employees, absent discriminatory purposes. The Court finds that "reasonable accommodation" does not require an employer to remove a more senior employee from the assignment or shift of his choice in favor of the religious preferences of a less senior employee. In this case, in fact, some mechanics were also drivers and also Teamsters, and entitled to be posted.

This is especially true given the particular occasion which precipitated Taylor's discharge. Arlington clearly could not have reasonably accommodated his religious beliefs on that evening. Arlington denied Taylor the opportunity to leave at 5:52 for his 7:00 P.M. church service on that occasion because the last truck was still en route back. Taylor was told he could not leave until the truck arrived, and that it was already on its way. Abraham testified that if plaintiff had stayed only nine more minutes, he could have then left for church at 6:01. The evidence showed that in the past he had often left on Wednesdays as late as 6:15 or 6:30 and had still been able to make it to church on time. His refusal to wait nine more minutes on July 8, 1987 was unreasonable. Furthermore, Plaintiff never asked either Cox or Justice to switch shifts with him on that day. Justice could not have worked the later shift anyway, because difficulties with his drivers license prevented him from driving any of his employer's trucks. Cox, of course, was the man whose calendar and pinups plaintiff had torn down and destroyed, and he testified that he and plaintiff had argued about that matter and that he had been very angry. Also, on the evening in question, Cox was working as a truck driver, and not as a mechanic, so he could not have stood

in for Plaintiff, who worked only as a mechanic.

## CONCLUSION

In summary, Plaintiff was denied the opportunity to leave at 5:52 for a 7:00 p.m. church service *once* in his two years of employment. For this, he walked off the job and has sued his employer for religious discrimination. Clearly, the employer denied him, this once, on an ad hoc basis, for good reason. The evidence is clear that Plaintiff's employer did in fact fully accommodate Plaintiff's religious belief for two years and continued to do so after implementation of its nondiscriminatory shift system. On the occasion in question, however, the degree of accommodation which Plaintiff demanded would have caused undue hardship.

Accordingly, it is ordered that Plaintiff's complaint be and it hereby is Dismissed.