957 F.2d 219
 58 Fair Empl.Prac.Cas. (BNA) 416,
58 Empl. Prac. Dec. P 41,335
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant,
v.
ARLINGTON TRANSIT MIX, INC.; and ARLINGTON MASONRY SUPPLY
COMPANY, Defendants-Appellees.
 No. 90-1686.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 26, 1991.
Decided Dec. 27, 1991.*
 
 David Ingram, Supv. Trial Atty., Karen A. Khan, Trial Atty., E.E.O.C., Mimi M. Gendreau, John H. Edmonds, E.E.O. Office, Detroit Dist. Office, Detroit, Mich., Lamont N. White (argued and briefed), Washington, D.C., for plaintiff-appellee.
 Eric G. Flinn (argued and briefed), Stewart, Lascoe, Nowak, Maceroni & Flinn, Sterling Heights, Mich., for defendants-appellees.
 Before GUY and NORRIS, Circuit Judges, WELLFORD, Senior Circuit Judge.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 The Equal Employment Opportunity Commission ("EEOC") initiated this action on behalf of Neil Taylor, alleging that his employers, Arlington Transit Mix, Inc., and Arlington Masonry Supply Co. (collectively "Arlington"), terminated his employment because of his religious beliefs, in violation of Title VII of the Civil Rights Act of 1964 ("Act"), 42 U.S.C. § 2000e-2(a) (1982). After a bench trial, the district court determined that although the EEOC had established a prima facie case of religious discrimination, Arlington had reasonably accommodated Taylor's religious needs for two years and could not continue to do so without incurring undue hardship. As a result, the court dismissed the action. 734 F.Supp. 804.
 
 I.
 
 2
 In its Memorandum Opinion the district court fully sets forth its factual findings, which we now summarize briefly.
 
 
 3
 Neil Taylor began his employment as a truck mechanic with Arlington Transit Mix, Inc., in June 1985. When hired, he informed defendants' plant manager, Kenneth Abraham, Sr., that he would need to leave early on Wednesdays to attend church services. Taylor was allowed to do so from June 1985 until July 8, 1987.
 
 
 4
 Arlington is a concrete ready-mix company and a dealer in packaged mortar and cement products. It owns about fifteen trucks, many of which are cement mixers. Due to their heavy use, repairs and adjustments are often needed when the trucks return to the shop. These repairs must be made in the evening because the trucks are typically scheduled to go out to other job sites early in the morning.
 
 
 5
 Arlington employed four mechanics: Taylor, Dana Justice, Charles Belcher, and Lee Roy Cox. During the period in which Taylor was permitted to leave early on Wednesdays, all four mechanics had the same starting times and, if necessary, all stayed overtime until the trucks were repaired.
 
 
 6
 In the spring of 1987, Arlington's management became concerned about the amount of overtime paid to its mechanics and decided to stagger their hours to maximize straight-time coverage. Mechanic Charles Belcher was appointed working foreman. In this capacity, he implemented a decision to start two of the four mechanics at 6:00 a.m. each day, and two at 9:00 or 10:00 a.m. Those who started early could leave at approximately 3:00 p.m., and the late starters could leave when the last truck had returned and all trucks were fit for the next day.
 
 
 7
 The plan operated loosely, and occasionally the early shift had to return to assist in the evening, or major repairs were left undone until the morning shift arrived. One rule was strictly followed: there were never fewer than two mechanics on duty at a time. This was for reasons of safety and also because mechanics could be called upon to leave the garage to attend to road service.
 
 
 8
 Belcher testified that the mechanics were all listed on the seniority board, which he consulted in organizing the new schedule. Although he would have preferred to take the early shift himself, he saw that mechanics Cox and Justice had the greatest seniority and gave them first choice. They chose the early shift, which meant that Belcher and Taylor had to work from 10:00 a.m. until closing.
 
 
 9
 On June 25, 1987, the shift changes took effect. At that time, Abraham informed Taylor that he would not be able to continue leaving early on Wednesdays as a matter of course. However, on July 1, the first Wednesday of the new schedule, Taylor was permitted to leave early because the trucks were all safely back in the garage.
 
 
 10
 On the following Wednesday, July 8, Taylor went to the dispatch office at 5:52 p.m. and announced that he was leaving for his church service. The trucks had not all returned and Abraham told Taylor that he could not leave and warned him that he would be fired if he insisted on doing so. Nevertheless, Taylor left for church. The following day, he was handed a letter discharging him for leaving the job without authorization.
 
 II.
 
 11
 Title VII prohibits an employer from discharging an employee because of his religion.[1] To avoid such unlawful discrimination, an employer must attempt to accommodate an employee's religious needs. The extent of this obligation is spelled out in the Act's definition of religion, which reads as follows: "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); see also Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 n. 1, 107 S.Ct. 367, 369 n. 1, 93 L.Ed.2d 305 (1986).
 
 
 12
 This court employs a two-step analysis in evaluating claims of religious discrimination. See Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir.1987), cert. denied, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). An employee bears the initial burden of establishing a prima facie case of religious discrimination. He meets the burden by showing that he holds a sincere religious belief that conflicts with an employment requirement, he has informed his employer of the conflict, and he was discharged for failing to comply with the conflicting employment requirement. 827 F.2d at 1085 (citing Turpen v. Missouri-Kansas-Texas R.R., 736 F.2d 1022, 1026 (5th Cir.1984)). In this case, the district court determined that there had been a prima facie showing of religious discrimination. This determination is not disputed on appeal.
 
 
 13
 Once a prima facie case is established, the burden shifts to the employer to show that it could not reasonably accommodate the employee without undue hardship in the conduct of its business. Id. Because it is a relative term, "reasonableness" must be determined on a case-by-case basis. See Redmond v. GAF Corp., 574 F.2d 897, 902-03 (7th Cir.1978).
 
 
 14
 In this case, the district court concluded that Arlington had accommodated Taylor's religious needs for two years, but could no longer do so without incurring undue hardship. The court reasoned that the new schedule was implemented to reduce excessive overtime pay. Because the seniority system was used in making work assignments, Arlington was unable to accommodate Taylor by placing him on the morning shift. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 82, 97 S.Ct. 2264, 2276, 53 L.Ed.2d 113 (1977) ("[A]bsent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences.").
 
 
 15
 While we accept the factual findings of the district court, we are unable to agree with its conclusion that Hardison is dispositive of this case.
 
 
 16
 In our opinion, the district court erred in viewing the employer's work scheduling and efforts at accommodating Taylor's need to leave work early on Wednesdays between June 1985 and July 8, 1987 as a single, continuous course of conduct. In point of fact, adoption of the new work schedule represented a clean break with the past, and the fact that Arlington accommodated Taylor under the old work schedule in no way indicates that the company adequately accommodated him under the new one. At the point Taylor was told he could no longer count on leaving early every Wednesday, the old accommodation was discarded, and the company adopted a week-to-week, wait-and-see posture that amounted to no accommodation at all. All that was in place was an ad hoc arrangement contemplating that the inevitable collision between Taylor's religious beliefs and the company's new work schedule would be dealt with when it arose. More was required of Arlington. Once the new schedule was implemented, the company should have made a reasonable attempt to accommodate his sincere religious needs.
 
 
 17
 The new scheduling policy was implemented on June 25, 1987. There is no evidence that, between that date and Taylor's dismissal, Arlington made any effort to find a way to avoid the collision. Mechanic Dana Justice testified that he would have exchanged shifts had he been asked to do so. Abraham acknowledged that he never told Taylor he could switch shifts with Justice if the latter were willing, nor did he discuss the matter with Justice. At a minimum, Arlington had an obligation to explore a voluntary waiver of seniority rights before terminating Taylor. After failing to pursue this or any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably his religious needs without undue hardship on the conduct of its business.
 
 III.
 
 18
 For the foregoing reasons, the order of the district court is reversed, and this cause is remanded to the district court for further proceedings according to law and consistent with this opinion.
 
 
 
 *
 This decision was originally issued as an "unpublished decision" filed on December 27, 1991. On January 31, 1992, the court designated the opinion as one recommended for full-text publication
 
 
 [1]
 Title VII includes the following provision:
 (a) It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 42 U.S.C. § 2000e-2(a).