**Ronnie ACKERMAN, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION "AMTRAK," a mixed ownership government corporation, et al., Defendants.**

No. 86–0746–CIV.

United States District Court, S.D. Florida.

Sept. 20, 1990.

Richard J. Burton & Assoc., P.A., Joyce M. Siemon, North Miami Beach, Fla., for plaintiff.

Morgan, Lewis & Bockius, Miami, Fla. by Terence G. Connor, for defendants.

## MEMORANDUM OPINION

SCOTT, District Judge.

Plaintiff Ronnie Ackerman brings suit against Defendant National Railroad Passenger Corporation ("Amtrak") and individual Defendants who are or were employees of Amtrak, alleging violation of their constitutional rights and of their rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.* ("Title VII"). Plaintiff alleges that Defendants engaged in unlawful employment practices in violation of Title VII by discharging him because of his religious beliefs. Defendants deny all the allegations of unlawful discrimination.

## I. FINDINGS OF FACT

Ronnie Ackerman is a member of the Orthodox Jewish faith. He is thirty-seven years of age. He is well-educated and intelligent. Mr. Ackerman attended various junior colleges and received a B.A. from the University of Florida. Ackerman has a checkered employment history with various entities, including clerk of court, paralegal and sales.

Ackerman testified that he always has had a fascination with trains.

In 1981, he first applied for employment at Amtrak, but his application received no response. Ackerman persisted in his attempts to obtain employment at Amtrak, and ultimately, in July, 1984, his efforts paid off. In June 1984, Ackerman wrote Amtrak and enclosed a resume. He received a favorable response from the Miami Amtrak personnel office, and in July, 1984, Ackerman interviewed with Amtrak officials. The date of the first interview was July 2, 1984.

The Court has carefully examined all the documents submitted by Plaintiff to the Defendants in his attempts to seek employment. Close scrutiny reveals that nowhere in these documents does Plaintiff disclose his religious needs. Quite to the contrary, there appears to be an affirmative representation by Ackerman that he has no restrictions to his employment. For example, the Court notes this statement, "I have also been told that I might be an unassigned clerk. This all would be totally acceptable to me." Parenthetically, we observe that the job of unassigned clerk clearly contemplated 365 days a year availability by the applicant. We further observe that the Plaintiff's own testimony demonstrates that he thoroughly knew the workings of Amtrak, the job description and its requirements. Indeed, as Ackerman testified, he knew more about this than Amtrak personnel. In short, Plaintiff's own admissions belie his further testimony that he did not know the requirements of the job of "unassigned clerk." Accordingly, the Court concludes that he knew and proceeded nonetheless.

This takes us to the July 2, 1984 interview. On that day, Mr. Ackerman interviewed with Gary Mauch and Walter Cruz.

During the course of both interviews, the job at Amtrak was discussed. It would defy logic to suggest it was not. Indeed, it was made clear to the Plaintiff that his job included duties as a porter, ticket clerk and in the commissary. At no time did Ackerman disclose to Cruz or Mauch his religious needs for being off from work at sundown Friday to sundown Saturday, and/or the Jewish holidays. Indeed, Plaintiff admitted that if he had disclosed it, undoubtedly he would not have been hired. Further, Defendants made it clear during the interviews that he would be working a 365 day availability; that his job was back-up to more senior employees; and that in light of this, he would be on call at any time of the night and day to come to any of the Amtrak stations in Miami, Fort Lauderdale and West Palm Beach. Mauch testified that Ackerman continued to represent that he would do anything to work for the railroad. There was no indication by the Plaintiff that he had any employment problems.

The record reflects that Ackerman began employment on July 4, 1984, received employee identification on July 5, 1984, and worked on July 9, 10, 11 and 12, 1984. He was off on July 13, 1984.

On July 11, 1984, Ackerman approached Arnie Moore to tell him of the problem and to request that he be permitted to be off from sundown Friday to sundown Saturday. Moore told Ackerman he would get back to him. On July 12, 1984, Moore told Ackerman he would be expected to work on Saturday July 14, 1984.

This leads us to the rather pivotal meeting of July 13, 1984. On that day, Ackerman and Ms. Joy Barkan went to the Amtrak office. It is uncontroverted that Ackerman was planning a lawsuit against Amtrak based on religious discrimination. Ackerman had already clearly contacted legal authorities at this point. Ackerman was accompanied to the meeting with Joy Barkan, but he misrepresented to Amtrak personnel her true identity. Ackerman claimed that Barkan was his mother. (This was a total falsehood.) Believing this to be true, Amtrak permitted her to attend the meeting. At the meeting, Mauch told him that because of the collective bargaining agreement he could not let him off on Saturday; other employees had seniority, and his hands were tied.

On that same day, July 13, 1984, Ackerman called Washington, D.C. and spoke to Sally Garr who was legal counsel for Amtrak. Garr "checked the matter out," and, on July 16, 1984, she advised Mauch to disallow the employment. As a result, Mr. Mauch called Ackerman and told him his application had been disallowed and to turn in his company property. On July 16, 1984, the Company sent him a certified letter. Various correspondence followed between Amtrak and the company.

Other pertinent witnesses included Sarah Chamberlain, who was the Vice President of the Protective Committee for BRAC, the union in question. It would be an understatement to say that the Union was vehemently opposed to Mr. Ackerman's requests to be off on the Sabbath and provide other accommodations. In effect, Chamberlain told Ackerman and Amtrak that there was no way the union could compromise on Ackerman because it would be compromising the rights of other employees and thirty years of experience.

In the defense presentation, Amtrak offered evidence through the Defendants concerning its employment agreement with the union and the impact of Ackerman's requests on Amtrak.

## II. CONCLUSION OF LAW

Title VII prohibits discrimination based on religion. Based upon our review of the record, the Court finds no evidence of affirmative religious discrimination against Ackerman. In the present case, however, the discrimination charge has been intertwined with the question of reasonable accommodation. Title VII's prohibition on religious discrimination defines religion as follows:

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance

or practice without undue hardship on the conduct of the employer's business. Title 42 U.S.C. 2000e(j).

The only real issue then is whether Defendants failed to carry out some reasonable accommodation for Ackerman's religious needs. That issue, in turn, is controlled by the seminal opinions in *International Brother hood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). *See also Wisner v. Truck Central*, 784 F.2d 1571 (11th Cir.1986). The facts in *Hardison* are very similar to those in the present action. To briefly summarize: Upon his transfer to a requested position, Hardison lost a considerable amount of seniority status. As a result, he was unable to obtain a shift that would allow him to observe his Sabbath. The Union, with whom TWA had a collective bargaining agreement, refused to allow Hardison a better shift preference as this would violate the seniority provisions of the agreement. TWA's refusal was based on the premise that to allow Hardison to take Saturday off in order to observe his Sabbath would impair the functioning of his work area. The Defendants contended that any further accommodations in favor of Hardison would be an undue hardship. The Supreme Court agreed, and held: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." *Hardison*, 432 U.S. at 84, 97 S.Ct. at 2277. Therefore, the test is whether any of the considered accommodations in the present case tend to impose more than a *de minimis* cost to the Defendants. *See also Wisner v. Truck Central*, 784 F.2d at 1571 (11th Cir.1986).

On this issue, the record reflects, and we so find, that:

a. Amtrak attempted to accommodate Plaintiff by reviewing available options to determine whether it could do so without overriding seniority rights of co-employees and/or paying overtime rates or incurring other expenses;

b. None of Plaintiff's accommodation proposals could be implemented without overriding other employees' seniority rights under the Agreement and/or paying weekly overtime rates or incurring other expenses;

c. Plaintiff proposed several flexible work schedules by which he could guarantee days off, but they could not be arranged for him because the job of unassigned clerk is to be on short notice call seven days per week and because all assignments are made on a seniority basis pursuant to the Agreement;

d. Plaintiff proposed a voluntary "shift trading" arrangement between himself and other employees. This was unworkable because Plaintiff had no assigned shift to trade and because any unavailability for assigned work created "short vacancies" to which others were entitled pursuant to Rules 7 and 14 of the Agreement;

e. No other positions for which Plaintiff was qualified were available;

f. Since Amtrak employees use their seniority to bid for shift assignments and because shifts with Friday nights and Saturdays off are inevitably chosen by senior employees, it would have been many years before Plaintiff would have accrued enough seniority to bid his Sabbath and religious holidays;

g. The Union strongly advised Amtrak that it would not allow any deviation from the "job choice by seniority provisions" of the collective bargaining agreement to accommodate Plaintiff;

h. The Union advised Plaintiff on or about July 12, 1984, that it would not consent to a modification of the seniority agreement to allow him to be absent for his religious observances because it would violate the rights of other employees it represented;

i. After consulting with Amtrak's Labor/Equal Employment Opportunity counsel, Defendants advised Plaintiff that his application for permanent employment was disallowed; and,

j. Finally, in light of Plaintiff's misrepresentation of his employment history

when he applied for employment with Amtrak, he would have been terminated regardless of his religious requirements.

In short, balanced against Ackerman's interest in having his religious practices respected are the interests of not one party, but three—the employer, the union and the co-employees. This trilogy of interests clearly outweighs Ackerman's interest in the following manner:

1. The employer's interest involves such matters as premium pay to other employees who "fill-in" for Ackerman during his Sabbath and possible loss of efficiency that may result from being understaffed;

2. The union's interest in preserving the terms of its collective bargaining agreement which would be violated if Amtrak ignored seniority by granting Ackerman a preferential work schedule;

3. Ackerman's co-employees interests in avoiding the prejudice which would follow if he were granted a preferential work schedule.

The Court concludes Amtrak and its employees attempted to accommodate Ackerman by reviewing available options in an effort to satisfy his needs without overriding seniority rights of co-employees or incurring unnecessary expenses. *Rohr v. Western Electric Co., Inc.*, 567 F.2d 829 (8th Cir.1977).

### III. RELIEF

Based upon these findings and conclusions, it is ordered as follows:

1. Judgment will be entered for the Defendants. The Defendants shall forthwith submit a judgment in accordance with this Memorandum Opinion.

2. The Court retains jurisdiction to consider any appropriate and timely post-trial motions;

3. All other motions not previously ruled on are hereby denied.

DONE and ORDERED.