OPINION OF THE COURT
Titone, J.
Our State’s Human Rights Law prohibits employers from discriminating against their employees because of their religiously motivated Sabbath observance (Executive Law § 296 [10] [a]). Recognizing that there may be circumstances in which the mandate of the statute conflicts with the strictures of a collective bargaining agreement, we have previously held that an employer caught in such a conflict is obligated only to make a "good faith” effort to accommodate a Sabbath-observing employee (Matter of Schweizer Aircraft Corp. v State Div. of Human Rights, 48 NY2d 294, 299). The present appeal requires us to apply that principle and to delineate some of the contours of what a "good faith” effort is.
Respondent Mary Myers is a practicing Seventh Day Adventist. The tenets of her religion forbid her from engaging in any form of work on the Sabbath, which extends from sundown on Friday to sundown on Saturday. In June of 1988, Myers was hired as a full-time bus operator trainee by the New York City Transit Authority, which operates its buses on a seven-day per week, 24-hour per day basis. From the outset, Myers made it clear to her supervisors that her religious commitments would prevent her from working between sundown on Friday and sundown on Saturday.
During her training period and the first week of her regular employment, Myers’ Sabbath observance presented little conflict with the demands of her job. However, a problem arose shortly thereafter because she was assigned Wednesdays and *84 Thursdays as her days off, a schedule requiring her regularly to work on her Sabbath. Under the terms of the collective bargaining agreement between the Authority and the Transport Workers Union, the privilege of selecting weekly days off was allocated in accordance with a strict seniority system. Ordinarily, employees were not able to choose weekend days as their days off under this system until they had accumulated as much as five years of seniority.
According to the testimony, Myers spoke with several of her employer’s representatives in an effort to obtain some accommodation for her Sabbath observance. Her request for "split” days off was rebuffed on the ground that the practice was forbidden by the collective bargaining agreement. Her request to be permitted to work an early shift on Friday was initially granted, but the Authority denied her request to postpone her Saturday service until after sundown because there were no bus run shifts that began after 5:00 and because respondent had not been trained for other available work. After a few weeks, even her Friday afternoon accommodation was withdrawn. The only solution suggested to Myers was to find another worker in her depot who would be willing to trade shifts with her. However, the Authority did not offer to assist her in locating a willing co-worker. Instead, a supervisor told her that she would have to stand at the door as the bus drivers were leaving and ask each of them if they would consider an exchange of shifts.
Having failed to obtain an accommodation or to locate a coworker who was willing to "swap” shifts, Myers began taking unauthorized days off. Although she called in on several occasions to report her plans to absent herself, she did not think it necessary to call in each time, since her employers knew that she was unwilling to work on her Sabbath. Myers was ultimately discharged on October 10, 1988 because of her unexcused absences.
Following her discharge, Myers filed a complaint with the State Human Rights Division, alleging that the Transit Authority and the Transport Workers Union had violated Executive Law § 296 (10) (a). The Division found probable cause to believe that a violation had occurred and directed that a hearing be held.
At the hearing, a labor relations specialist for the Authority testified that the Authority had a policy to accommodate Sabbath observers only if it could be accomplished without ad *85 ditional cost, disruption of scheduled runs or risk of labor strife. He acknowledged that Sabbath observers such as respondent were caught in a Catch-22 situation, since they would have difficulty securing accommodations unless they had seniority and they could not obtain seniority without working on weekends for several years.
This testimony was echoed by an attorney employed by the Authority, who stated that the union was unwilling to waive seniority rights to accommodate Sabbath observers. It was also reinforced by a union representative who stated that although it was aware of the existence of isolated voluntary swaps, the union would oppose any such "swaps” that were arranged by the Authority to accommodate recently hired Sabbath observers. Such arrangements, in the union’s view, would necessarily violate the contract’s seniority system to the extent that they were offered on a basis other than duration of service. The collective bargaining agreement itself, however, made no specific reference to voluntary "swaps.” There was no testimony regarding specific attempts by the Authority to negotiate a compromise with the union, either specifically on Myers’ behalf or on behalf of all Sabbath-observing employees.
On the basis of the evidence adduced at the hearing, the Human Rights Division concluded that both the Authority and the union had violated the statutory provisions prohibiting discrimination against Sabbath observers. The Division found that both parties had failed to make good-faith efforts to accommodate respondent, despite a statutorily imposed duty to do so. The Division noted that there had been no efforts by either the Authority or the union to make arrangements for a voluntary exchange of shifts, that the parties’ collective bargaining agreement did not preclude such a voluntary exchange and that the Authority had not shown that accommodating Myers would result in economic hardship or serious labor difficulties. Accordingly, the Authority was directed to reimburse Myers, with interest, for her lost back pay. Additionally, the Authority and the union were each directed to compensate her for her mental anguish, and both were ordered to accommodate her Sabbath observance in the future.
The Authority and the union brought the present CPLR article 78 to challenge the Division’s determination. On transfer from the Supreme Court, the Appellate Division annulled the agency’s order, concluding that the seniority provisions of the Authority’s collective bargaining agreement foreclosed any realistic possibility of accommodating Myers. *86 Since the Division had erroneously ignored the effect of these provisions, the Appellate Division held, its ruling was not supported by substantial evidence. We now reverse the Appellate Division’s order insofar as it exonerated the Transit Authority.
Before discussing the Transit Authority’s duty under Executive Law § 296 (10), we turn briefly to the application of that statute to the collective bargaining agent, the Transport Workers Union.[1] Executive Law § 296 (10) (a), the sole predicate for this Human Rights Law proceeding, makes it unlawful "for any employer to prohibit, prevent or disqualify any person from, or otherwise to discriminate against any person in, obtaining or holding employment, because of his observance of any particular day or days * * * as a sabbath * * * in accordance with the requirements of his religion” (emphasis supplied). By its terms, the prohibition is aimed only at employers, a class that plainly does not include the Transport Workers Union in this situation.
Respondent Myers’ contention that Executive Law § 296 (10) should be construed to encompass union conduct is not convincing. "Labor organizations” and "employers” are defined separately in the Human Rights Law (see, Executive Law § 292 [3], [5]), and their substantive obligations are also separately delineated (see, id., § 296 [1] [a], [c]-[e], [g]). Further, Myers’ argument is unpersuasive because it rests on policy considerations that can only be addressed by the Legislature. While it may be true that the goals of the statute could be implemented more comprehensively if it reached unions as well as employers, the inclusion of unions would raise a host of other issues. Weighing these issues and the disadvantages of requiring unions to cooperate in the accommodation of Sabbath observers against the benefits of such a choice is a task that should be reserved for the legislative branch of government.
Having concluded that the Transport Workers Union was not a proper party to this Executive Law § 296 (10) proceeding and that the discrimination charges against it should have been dismissed on that ground alone, we turn now to the central question before us: whether the Transit Authority, the *87 complainant’s employer, violated that statute by failing to make a good-faith effort to accommodate her Sabbath observance. Our analysis of the question begins with this Court’s holding in Matter of Schweizer Aircraft Corp. v State Div. of Human Rights (supra). In Schweizer, a business that operated on a two-shift basis refused to employ a Sabbath-observing Seventh Day Adventist. The employer claimed that it had declined to hire the complainant because his religious observance would have prevented him from working on Friday night, there were no vacancies on the day shift, which was usually reserved for more senior employees, and two supervisors concluded that it would be "unworkable” to locate a day-shift employee who was willing voluntarily to transfer to the night shift. This Court held that the State Human Rights Division had not erred in adjudging the employer guilty of violating Executive Law § 296 (10) (a) under these circumstances, since the employer had made no efforts to accommodate the complainant’s religious observance by at least trying to find an existing day-shift employee willing to exchange shifts for the critical Friday evening Sabbath. In so ruling, the Court was careful to note that an employer is not obligated to assist a Sabbath-observing worker to arrange a voluntary shift swap where "clearly prohibited from doing so by nondiscriminatory provisions of its collective bargaining agreement” (48 NY2d, at 299).
Relying on this language, the Transit Authority argues here that it was excused from its duty to accommodate respondent Myers because it had a collective bargaining agreement with the Transport Workers Union requiring that senior employees be given preference in selecting their days off. Myers and the Division contend, in contrast, that the collective bargaining agreement did not expressly prohibit voluntary "swaps” and therefore did not shield the Transit Authority from its good-faith responsibility. In respondents’ view, the affirmative responsibilities imposed on employers under Executive Law § 296 (10) precluded the Authority from simply accepting without question the union’s position that even a voluntary "swap” arrangement sponsored by the employer would violate the seniority provisions of the labor contract. Instead, according to respondents, the Authority was obligated to dispute the union or even to seek arbitration on the effect of the seniority clause in order to accommodate Myers’ religious needs. We find neither position wholly convincing.
The Division’s contention in this case that the Authority should have adopted an adversary stance and disputed the *88 union’s expansive interpretation of the seniority clause on complainant Myers’ behalf is flawed. Executive Law § 296 (10) directs that employers refrain from discriminating against Sabbath observers by not penalizing them for their inability to comply with the employer’s normal rules of attendance. The statute requires that employers must take all reasonable steps, short of those involving "undue economic hardship” (see, id., subd [c]), to "accommodate” Sabbath observers — a term that denotes giving consideration to or making room for an individual’s special needs. It does not necessarily require, however, that the employer become the Sabbath observer’s advocate by initiating adversarial proceedings against a third party such as a collective bargaining agent in an effort to narrow the scope of contractual protections afforded the other employees (cf., State Div. of Human Rights v Carnation Co., 42 NY2d 873, 875). Such a requirement could be unduly burdensome to the employer, could create practical administrative compliance conflicts and, additionally, could well lead to other inequities among employees in the work place.
In this connection, we deem it significant that the disputed collectively bargained provision in this case involved a bona fide, nondiscriminatory system for distributing days off according to the public transportation employees’ longevity of service. Where there is no prior history of invidious discrimination within the particular business or industry, such seniority systems often operate to promote antidiscriminatory values by providing a neutral and fair method for allocating scarce benefits and privileges among employees (see, Trans World Airlines v Hardison, 432 US 63, 78-82). Given the utility of these seniority systems, it would be unreasonable to construe and apply our State Human Rights Law in such a way as to compel employers to challenge a union’s rational interpretation of the shop’s existing seniority plan.
On the other hand, we decline to read Executive Law § 296 (10) in such a way as to render it toothless, as the Authority’s argument suggests. The richness and strength of our society lies, in part, in its hospitality to religious diversity. Executive Law § 296 (10) represents a legislative expression of the high value that our State places on supporting and protecting such diversity and in prohibiting invidious discrimination based on religious choice. The statute ensures that no citizen will be required to choose between piety and gainful employment, unless the pragmatic realities of the work place make accommodation impossible. In mandating that all reasonable efforts *89 to accommodate be made, the Legislature sought to strike a fair balance between our State’s citizens’ interest in the free exercise of their religious beliefs and the practical needs of the business community and the Sabbath observer’s co-workers. It is in light of those underlying aims that the statute must be interpreted and applied. In this case, although the Authority did not have to go so far as to file a formal grievance to force the union to permit it to arrange a voluntary "swap” for Myers, the Authority did have a duty to take reasonable steps short of such labor litigation in an effort to reach an accommodation of Myers’ religious needs. The record, however, is devoid of proof that any such steps were taken.
There is no proof, for example, that the Authority’s managers had approached the union in an effort either to negotiate an over-all plan to accommodate Sabbath observers or to secure a specific waiver of seniority rules for Myers individually. While the union’s attorney testified in general terms that the union was not willing to waive seniority, there is no way of knowing on this record that that posture would not have changed after a bilateral discussion of the problem. If the union remained unmoved on the seniority question, there were still other possible avenues for compromise, including the possibility of obtaining a waiver of the rule against "splitting” days off. Indeed, although not part of the record on appeal, the parties have acknowledged that during the pendency of this litigation the employer and the union managed to reach an amicable solution to this kind of problem.
Even apart from efforts to secure the union’s assent to a waiver or other compromise, there were other measures that the Transit Authority might have shown it had explored in order to find a place for Myers within its large and diverse organizational structure. For example, the hearing evidence raised the possibility that Myers’ religious needs could have been accommodated by allowing her to leave work early on Friday and come in late on Saturday. There was evidence that Myers had, in fact, been given an early Friday shift during the initial days of her employment. Although a Transit Authority supervisor testified that a late Saturday assignment for Myers was not possible because she was not trained for the only available work, there was no proof that it would have been impractical to give her whatever training was required. Finally, since Myers was designated an "extra”, it is not at all clear that her presence on Saturday could not have simply been dispensed with at little or no cost or inconvenience to the Authority. In *90 any event, having failed to show that it tried at all to accommodate Myers in these or other ways, the Authority did not satisfy its burden of proving before the Human Rights Division that her presence was "essential to prevent undue economic hardship” (see, Executive Law § 296 [10] [c]; Matter of Schweizer Aircraft Corp. v State Div. of Human Rights, supra, at 299).
In the final analysis, what the "good faith” standard set forth in Schweizer requires is that the employer show that it exerted reasonable efforts to accommodate its Sabbath-observing employees. This standard does not require proof that an accommodation was actually found, but rather that a genuine search for reasonable alternatives was undertaken (id., at 299; see, State Div. of Human Rights v Carnation Co., 42 NY2d 873, 875, supra). Since there was no showing that such a search was conducted here and since it is undisputed that Myers was discharged only because of her inability to work a normal weekend shift, the finding of the Human Rights Division that the Authority violated section 296 (10) was supported by substantial evidence and its determination should be upheld.[2]
Contrary to the views expressed by the dissent, there is no need to remand the matter for consideration before the agency. Once the Division found probable cause to believe discrimination had occurred and set the matter down for a hearing (see, Executive Law § 297 [2] [a]; [4]), it was incumbent on the Authority to come forward with whatever proof it had to show that an accommodation could not have been accomplished without undue economic hardship. Having chosen to rely exclusively on the existence of a union-enforced seniority system to establish its economic hardship defense, the Authority cannot now claim that it should, in fairness, be given a new opportunity to recast its strategy and put forth a different set of facts in defense of its position.
*91 State Div. of Human Rights v Carnation Co. (supra), on which the dissent relies, is inapposite. In contrast to this case involving an agency determination made after a full evidentiary hearing, Carnation concerned the propriety of a discrimination complaint’s dismissal at the probable cause stage of the proceeding, before any evidentiary hearing was held. Our decision to remand for a hearing on the economic burden issue in Carnation was the inevitable and unremarkable consequence of our conclusion that the proceedings on the complaint should have been permitted to go forward. Carnation certainly does not suggest that a party who has had a full opportunity to present its factual claims in a hearing should be given a "second bite” when its proof is found wanting and the agency’s unfavorable determination is upheld on appeal.
Accordingly, the order of the Appellate Division should be modified in accordance with the opinion herein, with costs to complainant against petitioner New York City Transit Authority, and the matter remitted to that Court for consideration of issues raised but not considered on the appeal to that Court and, as so modified, affirmed, with costs to petitioner Transport Workers Union against complainant.

. We reject respondent Myers’ contention that the Transport Workers Union cannot raise this issue because it is not an appellant in this Court (see, Oden v Chemung County Indus. Dev. Agency, 87 NY2d 81, 89). As a party respondent in this appeal, the union is entitled to raise any claim of legal error below, "as long as [the claimed] error has been properly preserved and would, if corrected, support a judgment in [its] favor” (Parochial Bus Sys. v Board of Educ., 60 NY2d 539, 546).

. The Division rejected the employer’s position, in part because of its view that the seniority provisions of the collective bargaining agreement did not actually bar voluntary shift swaps. On this point, the Division’s analysis missed the mark. Whatever the correct interpretation of the agreement might be, the salient fact remains that the union took the position that an employer-arranged shift exchange would violate it. As previously noted, the Authority was not obligated to take unilateral steps to protect Myers in direct defiance of the union’s position. Despite this misstep, however, the Division’s final conclusion remains valid, since, regardless of the effect of the collective bargaining agreement, the Authority could have sought a negotiated compromise or an alternative solution that did not bring it into conflict with the union at all.